WILLIAM M. KINGSLAND, as Sole Surviving Trustee, etc., Appellant, v. THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK et al., Respondents.

In an action to recover damages for the destruction of plaintiff's wharf-right, consequent upon the construction by the city of New York, under the act of 1871 (Chap. 574, Laws of 1871, amending chap. 137, Laws of 1870), of an exterior line of docks, it appeared that plaintiff was the owner of the wharf-right for the length of the bulk-head between two piers in the Hudson river, which bulk-head formed part of the water-line of West street. In 1851 the common council of the city passed a resolution giving to the then owners of said wharf-right permission "to pile and bridge out for a distance of thirty-five feet beyond the bulk-head." Said owners built a platform on piles extending out thirty-five feet into the river. Subsequently permission was given by the common council to a steamship company, lessees of the bulk-head and owners of one of the adjoining piers, to build a platform in front of the bulk-head extending sixty-five feet westerly, and upon this to build a shed, the permission so given to be operative only during the pleasure of the city. Said lessees built a platform seventy feet out from the line of the old platform and upon this built a shed, using the old platform as a

means of approach. This extension was built after the adoption by the city of the plan of harbor improvements provided for by said act of 1871. *Held*, that the value of the use of said platform could not properly be taken into consideration as an incident of the wharf-right as, *first*, the permission originally given was in contravention of existing laws, and so was unlawful and void (Chap. 80, Laws of 1798; chap. 129, Laws of 1801; chap. 378, Laws of 1875); *second*, if lawful, it was merely a license, revocable in its nature, and the value of its use was a pure gratuity while the permission lasted; *third*, the extension was forbidden by the act of 1871, because inconsistent with the plan adopted.

Also, *held*, that plaintiff acquired no right to the use of the platforms or to claim damages for their destruction under the act of 1875 (Chap. 249, Laws of 1875), authorizing the department of docks to grant permits for the maintenance and construction of sheds, and legalizing existing structures upon piers and bulk-heads; as the act in no respect authorized platforms and sheds beyond the bulk-head line, and the permits were revocable in their nature.

Also, *held*, that when the city, acting under the law of 1871, adopted a plan which involved the termination of all private ownership of docks, and wharves and in the progress of the improvement directed the removal of the platforms and shed, it revoked plaintiff's license; that such action on the part of the city operated to destroy plaintiff's wharf-right, and for that, and also the right of preferential use by steamship lines attached to his bulk-head by statute (Chap. 261, Laws of 1858), he was entitled to compensation; but not for the revocation of the license or deprivation of the use of the platforms and shed.

(Argued June 14, 1888; decided October 26, 1888.)

APPEAL from order of General Term of the Supreme Court in the first judicial department, made January 19, 1887, which reversed a judgment in favor of plaintiff, entered upon the report of a referee and ordered a new trial. (Reported below, 45 Hun, 198).

This action was originally brought by plaintiff, as sole surviving trustee under the will of Daniel C. Kingsland, deceased, to restrain defendants from further filling in and to require them to remove a bulk-head erected and solid filling deposited by them in front of plaintiff's bulk-head on the Hudson or North river, and to recover damages. By agreement of the parties the action was considered and tried as one to recover compensation for the value of plaintiff's rights.

Plaintiff claimed under two conveyances from the city known as "water grants," conveying lots under water, together about

104 feet wide on the westerly side. The grants contained cove-
nants on the part of the grantees to build a good and sufficient
wharf or street seventy feet wide, to be called West street, in
front of and contiguous to the westerly end of the premises
granted, the same to remain a public wharf or street. Each grant
contained a covenant on the part of the grantor that the grantee
on fulfilling and keeping the covenants on his part " shall and
lawfully may from time to time, and at all times, forever here-
after fully have, use and enjoy  *  *  *  all manner of
wharfage, cranage, advantages and emoluments growing or
accruing by or from said wharf or street." Subsequently the
wharf or street was constructed as required by the grant.

Under the act (Chap. 383, Laws of 1870, as amended by chap.
574, Laws of 1871), and in carrying out the plan adopted by
the department of docks a new bulk-head line was erected on
a line parallel with the west line of West street, distant about
180 feet westerly therefrom, and the intervening space was
filled in.

The further material facts are stated in the opinion.

*William W. MacFarland* for appellant. Where property
is condemned in the exercise of the sovereign power of eminent
domain for what the law recognizes as a public use, the owner
is entitled to a full measure of compensation. The rule by
which that compensation is determined is market-value, when-
ever that rule is available. (*In re F. St.*, 19 Wend. 649; *In
re W. & A. St.*, 19 id. 690; *Troy & Boston R. R. Co.* v. *Lee*,
13 Barb. 169; *In re W. G. L. & W. Co.*, 27 Hun, 116;
*Henderson* v. *N. Y. C. R. R. Co.*, 78 N. Y. 423; *In re
N. Y. & W. S. R. R. Co.*, 29 Hun, 611; *B. & R. Mill Co.*
v. *Newman*, 11 Pick. 467; Sedgwick on Dam. [7th ed.] vol.
2, 569, note; 2 Montesquieu's Spirit of Laws, 174.) The
defendants, by their omission to call any witnesses to controvert
or even mitigate the testimony of the experts that the property
is worth at least the amount found by the referee, admitted its
truth. (Lawson's Presumptive Ev. 120; 1 Greenleaf's Ev. § 37.)
There is no rule of law which in this particular case denies to

the plaintiff the market-value of his property and prescribes another and arbitrary measure of compensation. (*Langdon Case*, 93 N. Y. 137; Act of 1871, § 99; *Williams Case*, 105 N. Y. 437; *Smith* v. *Rochester*, 92 id. 463.) The court below erred in supposing that the market-value proved had any relation to profits or emoluments that might arise out of extension beyond the bulk-head line sheds, or the power to appropriate the property to exclusive use. (*In re N. Y. & W. S. R. R. Co.*, 29 Hun, 610.) No right or title can take root in a forcible entry. (Mackeldy's Roman Law, 166, § 200; id. 199, § 226; id. 208, § 254.)

*James C. Carter* and *Frank A. Irish* for respondents. Under the circumstances, this court will sanction a judgment for damages, based upon and including the permanent value of the plaintiff's property rights. (*Lahr* v. *Met. El. R. R. Co.*, 104 N. Y. 268, 293, 294; *Henderson* v. *N. Y. C. R. R. Co.*, 78 id. 423; *Langdon* v. *Mayor, etc.*, 28 Hun, 159; 93 N. Y. 122, 179.) Plaintiff, having elected to sue for the value, cannot also hold the defendants to any measure or rule of damages applicable to a trespasser. (*Uline* v. *N. Y. C. & H. R. R. R. Co.*, 101 N. Y. 98, 123.) Upon condemnation proceedings had by the defendants, under the act of 1871, the plaintiff would not have been entitled to compensation, based upon the continued maintenance of the shedded platform on the city's land, and the exclusive use resulting therefrom, or upon the chance or possibility of maintaining the same or of erecting other shedded platforms. (*Ex parte Miller*, 2 Hill, 418; *Fox* v. *Cincinnati*, 104 U. S. 783; *Hubbard* v. *City of Toledo*, 21 Ohio St. 379; *Erkenbrecher* v. *Cincinnati*, 2 Cin. Sup. Ct. R. 412; *Fishback* v. *Woodruff*, 54 Ind. 102.) It is not open to plaintiff to inquire into the reason why the board of docks revoked the license to maintain the shedded platform, or to call them to account for doing so. Having expressly reserved the power to revoke this license, they are entitled to do so, even arbitrarily if they choose. The plaintiff's rights are completely subordinate to this power or condition reserved

in the license itself.  (*Dermott* v. *State*, 99 N. Y. 101;
*Ex parte Miller*, 2 Hill, 418; *Mattoon* v. *Monroe*, 21 Hun,
74, 79; *Burbank* v. *Fay*, 5 Lans. 397, 401; 65 N. Y. 57.)
The license in question has been actually and sufficiently
revoked.  It did not require an express notice or resolution to
revoke it.  (*Ex parte Miller*, 2 Hill, 418.)  The shed and
platform in question were originally prohibited by section ·6,
chapter 574 of the Laws of 1871.  (*People* v. *Mallory*,
46 How. 281; *Comrs. of Pilots* v. *Clark*, 33 N. Y. 251.)
The license to build them, even if it were valid when granted,
must, from its form, be considered to have been revocable in
its nature.  (*Haldeman* v. *Penn. R. R. Co.*, 50 Penn. St. 425,
440; *State Reservation Case*, 16 Abb. N. C. 183, note.)
In deciding what should be awarded to plaintiff as just com-
pensation for his property taken by the public, neither the
purpose to which it was then applied nor his intention in
relation to its future enjoyment is to be considered; the proper
inquiry is, what is the value of the property for the most
advantageous uses to which it may be applied?  (*In re F. St.*,
17 Wend. 651, 670; *In re N. Y. L. & W. R. R. Co.*, 33 Hun,
644; 27 id. 116; *Trustees of College Point* v. *Dennett*,
5 T. & C. 217; *Boom Co.* v. *Patterson*, 98 U. S. 407;
*Central Pacific R. R. Co.* v. *Pearson*, 35 Cal. 247; *Eddings*
v. *Seabrook*, 12 Rich. Law [S. C.] 504, 510; *Burt* v. *Wiggles-*
*worth*, 117 Mass. 302; *S. W. & S. Railway Co.* v. *Abell*, 18
Mo. App. 632; *Union, etc., Co.* v. *Moore*, 18 Ind. 458;
*Moulton* v. *Newburyport Water-works*, 137 Mass. 163, 167.)
In all cases involving the exercise of the right of eminent
domain, where the question has arisen, the courts have held
that the use of the property of the public, enjoyed by its license
or sufferance, although entitled to be protected as against
every one except the state, gives rise to no claim against the
state or its grantee when the state desires to resume its use for
public purposes.  (*People ex rel. Loomis* v. *Canal Apprs.*, 33
N. Y. 461; *Orill* v. *City of Rome*, 47 How. 398; *People* v.
*Tibbits*, 19 N. Y. 523; 16 Abb. N. C. 159; *Patten* v. *N. Y.*
*El. R. R. Co.*, 3 id. 306, 325, 344; *Hatch* v. *C. & I. R. R.*

*Co.*, 18 Ohio St. 92.) This suit having been instituted as a method of ascertaining and recovering the value of the property rights in the same manner as it would be ascertained and paid for in a proceeding instituted for the condemnation of those rights to public use, the value must, therefore, be ascertained in like manner as it would be in a proceeding of the latter character; otherwise the action cannot be maintained at all. (*Uline* v. *N. Y. C. R. R. Co.*, 101 N. Y. 98.) It is incompetent for the court to give to the action the shape in which it can alone be maintained and which both parties wish it to assume. An injunction will not be awarded if the value correctly ascertained is paid, and it may be ordered that upon such payment the incorporeal right be conveyed. (*Henderson* v. *N. Y. C. R. R. Co.*, 78 N. Y. 423; *Lahr* v. *Met. El. R. R. Co.*, 104 id. 268, 293.) A tenant at will (which is what the plaintiff was), may recover substantial damages against the man who wrongfully ousts him. (*Ex parte Miller*, 2 Hill, 418.) Plaintiff's right to maintain a platform and shed having ceased it could no longer be the subject of compensation. (*Dermott* v. *State*, 99 N. Y. 101, 108, 109.) The referee in making his award erred in holding that the value is not to be determined by a reference to the revenue which the owner might derive from the bulk-head when used for the sole purpose mentioned in the grant, but by reference to the revenue which he might derive from it when it was viewed as capable of having the shedding privilege attached to it. (*Fox* v. *Cincinnati*, 104 U. S. 783; *Hubbard* v. *City of Toledo*, 21 Ohio St. 379; *Erkenbrecher* v. *Cincinnati*, 2 Cinn. Sup. Ct. 412; *Mattoon* v. *Monroe*, 21 Hun, 74, 79; *Burbank* v. *Fay*, 5 Lans. 397, 401; *S. C.*, 65 N. Y. 57.)

Finch, J. We have already determined that the destruction of the wharf rights belonging to private owners, consequent upon the construction by the city, under the act of 1871, of an exterior line of docks owned and controlled by the municipality, involved the necessity of compensation to such owners for the property rights thus taken away. (*Langdon* v. *Mayor*,

*etc.*, 93 N. Y. 129 ; *Williams* v. *Mayor, etc.*, 105 id. 419.)  What shall be the measure and basis of that compensation is the question now presented, and in a form which excludes damages for a tort or redress for a wrong, but treats the case solely as one in which the city takes, by right of eminent domain, the private property destroyed, and is simply bound to pay the fair and just value of what it has taken.  The parties litigant disagree widely as to that value, and mainly because certain privileges and incidental conveniences have become associated with the wharf rights as owned and possessed, and have added enormously to the prices along the water front.

Originally, as we have elsewhere said, the duty of building wharves and exterior streets and filling out to them, was imposed upon the riparian owners, and was, perhaps, for a time, more of a burden than a benefit, since such owner gained no exclusive rights in the wharf at his water front beyond that of the sums payable as wharfage, cranage and dockage by the vessels enjoying its use.  The wharf or exterior street was a public wharf, open to the commerce of the port, and the free passage of the people ; and authority to incumber it was not only wanting from its inherent nature and character, but any such incumbrance was positively forbidden by statute.  Nevertheless, the needs and convenience of commerce, and the persistent encroachments of private interest gradually pushed aside the prohibition of the law, or modified its restraints by new legislation.  Lines of steamers sought and obtained exclusive privileges at particular wharves, paying rentals therefor; which steadily grew to very large amounts.  They needed also sheds to cover and protect their freight, and these were built not only upon the piers but upon piles driven into the land under water in front of the wharves which bounded the exterior street.  These constructions gradually converted the public wharf into what became, practically, and for the time being, a private ownership, the price of which steadily increased as it encroached upon the public right, and fed upon the submission and endurance of the municipality.

This gradual progress toward the ultimate result and the

character of the privileges obtained may be usefully studied in connection with the history of plaintiff's wharf right, for the value of which this action is brought. It was situated between two piers numbered 44 and 45, respectively, and was a bulk-head forming the water line of the exterior street known as West street, and had a length between the two piers of a few inches over 104 feet. The city had constructed and owned pier 45, which was at the foot of Charlton street, and the ownership of pier 44 was in persons other than the plaintiff or his predecessors. They have, therefore, simply a wharf-right for the length of the bulk-head between the two piers. No vessel exceeding that length could lie at the wharf for the purpose of loading or unloading, and its use was consequently confined to canal boats and the smaller class of vessels carrying brick or lumber. Its separate value as a wharf was, therefore, small. It was rented in 1866 in connection with the upland lots used as a lumber yard for a total of $3,000 a year; a provision in the lease indicating that the wharf's proportion of the annual rent was $1,000. As late as about 1872 the lessees sublet the wharf for the last year of their lease for $800. And this moderate rental, but little more than the wharfage possible of collection, was charged and paid, although two things happened which added to the usefulness of the property. In 1852 the city, by resolution of its common council, permitted the owner of the bulk-head to bridge out, as it was called, or build a platform on piles extending thirty-five feet from the bulk-head line, which construction practically extinguished the wharf right as it was granted, or pushed it to the outer edge of the platform, and so gave to the owner an area for the landing and movement of freight outside of the exterior street. This platform stood upon the city's land under water, and the value of its use as an incident of the wharf right was a pure gratuity to the wharf owner while the permission lasted. That permission, however, was unlawful and void, and both given and acted upon in direct defiance of the existing statutory prohibitions. The law of 1798, which was then in force (Chap. 80), and the act of 1801 (Chap. 129,

§ 10), and Laws of 1875 (Chap. 378), forbade any structures, except piers and bridges connecting them with the street, outside of the bulk-head line or line of solid filling, and the city had no power to grant the permission given, and the wharf owner acquired no rights under it. Beyond that the permission, even if lawful, was merely a license and revocable in its nature, a privilege which the city might withdraw at any moment, and which it was its duty to withdraw.

But the pressure of lines of steamships for fixed and permanent accommodations along the water front led in 1858 to the enactment by the legislature of a law which did add value to the wharves and bulk-heads as sources of profit and revenue. That act (Chap. 249), provided, in substance, for what may be called a preferential use by steamboat lines when lessees of a pier or bulk-head. It gave them the exclusive use, so far as needed, for conducting their business, and left the wharf open to the public only when not needed for the boats of the line. Of course this reservation of a public right was rather formal than real, and the preferential use became, in fact, an exclusive use, since the lessee would be sure always to need the dock facilities, and the public would avoid a wharf from which they were liable at any moment to be removed. This privilege of exclusive use was a governmental regulation, indicating a settled and permanent policy, and over which the city had no control. It necessarily added value to every bulk-head or pier which the steam commerce of the port desired to lease and occupy, for it gave that commerce a permanent home at the water front, and secured to it undisturbed facilities for the transaction of its business. Previous legislation had gone no further than to permit the assignment of classes of vessels to specific localities, but leaving their rights at such points equal and without preference. The act of 1858 gave to the owner of a pier desirably situated, and at which the largest steamers could lie and receive or discharge their cargo, a rental value much beyond the mere wharfage collectible by law. And wherever a bulk-head was adjacent to a pier thus occupied

it became a desirable acquisition to the steamboat company occupying the pier. A lease of it would enable such company to control the entire slip or basin. They could push their vessels up to the bulk-head and occupy, in addition to the area of their pier, the one hundred feet of wharf forming the shore boundary for the reception or discharge of cargo. So much they could do lawfully, and it is not at all impossible that a bulk-head so situated had a somewhat greater value for purposes of a lease to a steamer line than the annual wharfage fixed by law. This increment of value, if, in fact, it existed, was a legal incident of the wharf right which belonged to the wharf owner, which did not depend upon any discretion of the municipality and which was taken from him when his wharf right was destroyed. Whether it added much or little to the value of that right we cannot accurately determine from the evidence.

In 1871 (Chap. 574), the city charter of the previous year was amended so as to change the whole dock system of the harbor. The law provided for a plan which should girdle the city with new wharves and piers, belonging wholly to the municipality, and ending all private ownerships along the water front. The wharves of private owners were to be purchased by agreement, or taken in the ordinary manner by proceedings under the right of eminent domain. Those rights, thus to be obtained, were described in the act as " any rights, terms, easements and privileges pertaining to any wharf property in said city and not owned by said corporation." Whatever could be held against the public was to be bought or taken, but what could not was already in their ownership or control. The act vested in the department of docks authority over the whole system and enacted that " from the time of the adoption of said plan no wharf, pier, bulk-head, basin, dock, slip or any wharf, structure or superstructure, shall be laid out, built or rebuilt, within such territory or district except in accordance with such plan." At this date sheds existed on many piers leased by steamer lines, and which excluded the last opportunity of anything like a public use and made them, in effect,

completely private wharves.  These sheds, whether erected with or without the assent of the city, were unlawful and a violation of positive law.  In *People* v. *Mallory* (2 S. C. [T. & C.] 76; 46 How. Pr. 281), the question was raised.  An attempt was made to argue from the use of the word "structures" in the act of 1871, an intention to legalize existing sheds and ratify their construction.  The attempt failed.  The court held, and I think with entire accuracy, that the act of 1871 in no manner made lawful the erection of sheds upon piers or bulk-heads; that no authority existed for their construction; and that they were forbidden by positive law.

In 1872 the Inman line of ocean steamships were lessees of pier 45 and had covered it substantially with a shed.  They had done this with the assent of the city, which could give no lawful assent, and were maintaining upon the pier a convenient and useful but illegal structure.  They had rented plaintiff's bulk-head from his lessees for a moderate rent to get rid of the lumber commonly piled upon it, and which threatened danger of fire and became the hiding place of tramps.  They conceived a plan for getting additional shed room which involved the complete extinction of plaintiff's wharf right.  Simultaneously they did two things.  They rented the bulk-head for $5,000 a year, and got permission from the common council to build a platform running the whole length of the bulk-head and extending sixty-five feet west over the water, and upon this to build a shed.  Not only was this permission without legal authority and incapable of transferring any legal right, but the action under it seems to have transcended the permission.  The agent of the company testifies that he built the platform out over the water, not sixty-five feet in width from the bulk-head line, but seventy feet from the line of the old platform, and on that extension built the shed and used the old platform as a means of approach.  It is agreed that the plan  provided for in the law of 1871 was formally adopted in April of that year.  The extension was built after the adoption of that plan, and was forbidden by the act of 1871, because inconsistent with the plan

adopted, as well as by the existing laws which fixed the bulk-head line and forbade any structures beyond it except piers and their approaches. In this manner the lessees destroyed the wharf right and occupied the city's land under water for a shipping warehouse, and it was for this illegal use that it paid its rent to the wharf owner, he consenting to the lawless act and charging a large price for that use. The *Mallory Case* was decided in 1873, and the decision inspired alarm among the wharf owners and their lessees, who saw the true character of their encroachments disclosed; and they appealed to the legislature, moved largely by their personal interests, but pleading the necessities of the growing commerce of the port.

In 1875 an act was passed, commonly known as "the shedding act," which authorized the department of docks to grant permits for the maintenance and construction of sheds upon the piers or bulk-heads, but these permissions were revocable in their nature, without consideration, and expressly subject to the rules and regulations of the department of docks to whose discretion the matter was confided. The act of 1875 gives no help to the plaintiff's case for two reasons. It authorized permits for sheds *upon* piers or bulk-heads, but in no respect authorized platforms beyond the bulk-head line and sheds upon them, and it expressly saved and preserved the prohibition of 1871. Besides, the permit of the Inman line was given in 1872, and while the act of 1875 legalized existing structures on the piers or bulk-heads, it, in legal effect, merely ratifies, if that be possible, the previous permission under which the structure was built, and that permission was in terms revocable and running only during the pleasure of the city.

Our investigation thus far discloses that the plaintiff, as owner of his wharf right, was entitled to the wharfage which it yielded, and such added value as its privilege of preferential use when leased to the adjoining steamboat line would give it, but beyond that had no other right as incident to his ownership. Neither he nor his lessees had any right to the platform or the shed upon it, and could be stripped of both at any moment by

an appeal to the law, or without that by a revocation on the part of the city.

That revocation came. The city acted under the law of 1871 by adopting a plan which involved the termination of all private ownership of docks and wharves and the construction of a new outer line. The improvement finally reached Charlton street. The municipality directed the removal of the platform and shed in front of plaintiff's bulk-head, and by that direction and the action taken under it effectually revoked plaintiff's license, if that needed to be revoked, which was never lawful at all and never had any right behind it. The city also constructed a new bulk-head in front of plaintiff's wharf, cutting the latter off from the water and destroying access by solid filling. By this latter process it took plaintiff's wharf right with its lawful incidents; and if the judgment which he recovered had embraced no more than the value of that, we should affirm it without hesitation. But much more than that was allowed. Some possibility of the continuance of plaintiff's platform and shed and the chance of such continuance was allowed to increase the value awarded when the possibility was ended and the chance did not exist. Evidence was given upon that basis, and the learned referee made it an element of his judgment and a ground of his valuation, for he defined what it was that he valued by adding, "the purchaser taking all the chances of being permitted to continue to maintain said platforms and shed and devote the property to exclusive use;" and the value that he fixed was upon "the plaintiff's said bulk-head, together with said riparian rights and privileges." By the latter phrase he plainly intended a right or privilege to build or maintain a platform and shed over the water, and assumed that as an existing right for the continuance of which some chance remained. So far as the platform and shed are concerned, we think the valuation, which reached over $100,000, was erroneous.

It must be kept in mind that the subject of valuation is not physical and tangible property which can be measured or weighed, but an incorporeal right which can only exist by

force of the law and under its shelter (*Langdon* v. *Mayor, etc., supra*), and can never be more than that law creates or sanctions.  The city took and was required to pay for such an incorporeal right, and its extent or value cannot be broadened or increased because its situation furnished a convenient opportunity to commit a trespass or maintain a nuisance.  Compensation was to be made for a wharf-right; not for a wharf-wrong; for what the law authorized and recognized; not for what it forbade and condemned.  The city did not take from the plaintiff the right to build a platform beyond the bulk-head line and maintain a shed upon it since he never had any such right to be taken away.  It never had an existence.  It stood only upon sufferance and that sufferance had ended.  Adding to the value of the wharf right, with its lawful incident of preferential use, by taking into account an unlawful platform and shed, and the chance of maintaining it unmolested, is giving to the property as an element of increased value, its convenient situation for violating the law and capitalizing the existing and expected profits of that violation.  The same reasoning might lead to an increase of value in cases much more harmful and reprehensible.  Suppose the city, under competent authority, should take a house and lot for the purpose of a park, and destroy the dwelling, and the owner seeking its value shows, that owing to its peculiar location, it can be rented as a house of ill-fame or as a gambling den for twice the rent obtainable for any lawful purpose, and when reminded that such uses are illegal, should answer that he had obtained such rental for years, and the city had winked at it and never once raided his house or enforced the law ; that he could have sold for the amount he claimed, the purchaser taking the chance of the blindness of the police or the endurance of the citizens ; and that what he could sell for to another in the same business was market-value, and market-value he should have ; we can all see the absurdity of that claim, but not so readily when the illegal use, for which value is claimed, is merely illegal and not also immoral and criminal.

The view we have just taken rests upon the absolute ille-

gality of any structures save piers outside of the fixed bulk-head line. That has been the uniform prohibition of the state and was essential to a permanent outer line, for, if wharf owners could push out beyond, the harbor was doomed and the legal bulk-head line a farce. The consolidation act of 1882, which gathered and compacted the laws affecting the city, repeats the prohibition. (§ 732.)

But if we concede some shadow of authority to the city's license, the situation is not changed. The license of the dock department to plaintiff's lessee was after the passage of the act of 1871, and by its very terms was operative only during the pleasure of the city. Those who received it knew when they received it that it conferred no fixed property right, but merely a privilege which the city might withdraw at any moment, and that the plan of 1871 contemplated and would compel that withdrawal. Until then they could afford to pay $5,000 a year rent, but would have been very far from buying the bulk-head for the capitalized value of that income. When the city acted the inevitable result was two-fold. It operated to destroy the wharf right which the plaintiff owned, and to that extent took from him his property. It operated also as a revocation of the license or privilege given. The value of the one the city was bound to pay; the value of the other it was not bound to pay. It could, as it did, revoke the license by removing or directing the removal of the platform and shed without the least responsibility for the resulting injury. That the taking and revocation happened at the same time cannot alter the inherent character of either.

The city not only did not take from the plaintiff the right to maintain a platform and shed in front of the bulk-head, but it did not get any such right from any source whatever, and will not have it when its own constructions are finished. And this is an answer to the suggestion pressed upon us that the value unpaid to the wharf owner the city will get for nothing. One thing in this connection should be observed. The city owned pier 45 and did not own the bulk-head. It will get a new pier in place of 45 and a new bulk-head in place of

plaintiff's; but it will not have and cannot have what he claimed to possess, a right to build out from the new bulk-head over the water and shed that extension, for the law forbids it. (Laws of 1882, § 732.) So that if it pays for plaintiff's unlawful structure, it will neither get that nor a new one in exchange, but give a large sum for revoking a license made without consideration and terminable by its terms at its own pleasure. If it gets shedding room inside of the new bulk-head, it will be because it owns the land and has extinguished plaintiff's easement of water approach.

The learned counsel for the appellant frames, as a test of our conclusion, a supposed collision between the city and the state after the new docks are built, and asks if the state should destroy them by a new exterior line, what would be the compensation due the city and whether it would be merely the value of the wharf right unaffected by the incidents of exclusive use and sheds for freight, or the value of that right with its incidents and as it stood when taken. The cases are not parallel. The state has a double right, as proprietor and as sovereign, and the capacity in which it acted might come in question; and the city will hold its wharf rights and their incidents by a different tenure from a bare license and under authority of law and after having paid a very large consideration. Without attempting to decide a hypothetical question little likely to arise, since the state will hardly seek to fence in its metropolis, it is enough to say that the cases are radically different as it respects the compensation to be paid and not such as to decide each other.

We are thus required to say that the referee erred in allowing as an element of value the existing platform and shed, and the chance of maintaining it in the future, and so the reversal by the General Term was right. But we do not hold that the wharf owner is entitled only to the capitalized value of his wharfage and cranage, for the law has attached to his bulk-head a right of preferential use by steamship lines, and this bulk-head adjacent to a steamship pier and in a desirable part of the harbor may have possessed a serious increment of

value resulting from that incident. For that value, honestly ascertained and fairly measured, the wharf owner should recover, but not for any value resulting from his platform and shed.

The judgment of the General Term should be affirmed, with costs, and judgment absolute for the defendants be rendered on the stipulation.

All concur, ex ept RUGER, Ch. J., and GRAY, J., dissenting. Judgment accordingly.