In the Matter of the Application of the CITY OF NEW YORK, etc., Relative to Acquiring Right and Title to and Possession of the Wharfage Rights, etc., Appurtenant to Pier Old No. 49, East River, in the Borough of Manhattan, etc., and to Wharfage Rights, etc., Appurtenant to Certain Bulkheads, etc., on or near the Southerly Line of South Street, etc., for the Improvement of the Water Front of the City of New York on the East River, etc.

MUHLENBERG COAL COMPANY, Appellant; THE CITY OF NEW YORK and NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Respondents.

ELIZABETH BAYLISS, Appellant; THE CITY OF NEW YORK and NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Respondents.

SARAH A. STILLWELL, Appellant; THE CITY OF NEW YORK and NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Respondents.

FREDERICK W. ARMSTRONG and Others, Appellants; THE CITY OF NEW YORK and NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Respondents.

First Department, December 20, 1918.

Eminent domain — proceeding by city of New York to acquire wharfage and bulkhead rights — damages — award — rights of coal company — incorporeal rights — wharfage and cranage rights — street not a marginal street or wharf — jurisdiction of commissioner of docks — limits of pier as basis of award — estoppel — award for shedded pier.

In a proceeding by the city of New York to acquire title and possession of wharfage rights, etc., appurtenant to bulkheads on the outer line of South street in said city, *held* that a coal company was not entitled to

an award for damages to its plant, but that the Special Term was in error in holding that the awards for bulkhead rights embraced awards for interests in the street, and that said separate award for bulkhead rights which embraces wharfage and cranage rights only, having been made on the proper theory, and being sustained by the evidence, should have been affirmed.

Said street having been constructed pursuant to a grant from the city of land under water and the grantee having covenanted to construct and maintain a sufficient wharf or street, the wharfage and cranage rights are incorporeal rights under which the owner has the exclusive right to collect the established rate of wharfage and cranage of vessels loading or unloading at the bulkhead.

Said street was a public and not a marginal street or wharf, and the jurisdiction over it is vested in the president of the borough and the board of aldermen and not in the commissioner of docks.

Although the wharfage rights of the coal company were used in connection with its plant across the street, said company was not entitled to an award for damages to its plant, there being no physical connection between the bulkhead and the property across the street, but said company, was entitled to an award for bulkhead rights, especially since it had expended a very large amount of money in so equipping its plant, in the expectation that it would be permitted to continue to enjoy the use thereof in connection with the bulkhead rights.

Owners of bulkhead rights adjacent to the pier were entitled to an award for the pier as it existed, and as it had been used by them and their predecessors for a period of upwards of fifty years, especially where the commissioners did not consider the additional length and width of the pier, and the city had acquiesced for a considerable time in the extension.

The award was properly made upon the theory that the pier was a shedded pier, although a permit for shedding it had been revoked, it appearing that the authority to revoke was exercised arbitrarily and solely with a view to reducing the award to be made in the condemnation proceedings.

SHEARN, J., dissented in part, with opinion.

APPEAL by the claimant, Muhlenberg Coal Company, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 16th day of December, 1916, in so far as it relates to the award for parcel No. 1 (A) herein and refuses to send the matter back to the commissioners for correction in accordance with appellant's objections.

Appeal by the claimant, Elizabeth Bayliss, from all of said order except in so far as the same concerns solely the property claimed by the Muhlenberg Coal Company.

Separate appeals by the claimants, Sarah A. Stillwell and

by Frederick W. Armstrong and others, from said order in so far as it denies confirmation of the report of the commissioners with respect to parcels Nos. 2 (B), 3 (C) and 4 (D) and refers the matter back to new commissioners.

*Charles A. Decker,* for the appellant Muhlenberg Coal Company.

*William H. Harris* of counsel [*George S. Mittendorf* with him on the brief; *Geller, Rolston & Horan; Charles C. Keeler* and *Harris & Towne,* attorneys], for the other appellants.

*Charles· J. Nehrbas* of counsel [*Charles D. Olendorf* with him on the brief; *William P. Burr, Corporation Counsel*], for the respondent The City of New York.

LAUGHLIN, J.:

Two awards were made to the coal company, one for $21,654 for seventy-two and eighteen one-hundredths feet of wharfage and bulkhead rights appurtenant to the bulkhead on the outer line of South street beginning at a point forty-eight feet west of the westerly line of Clinton street prolonged and extending westerly therefrom; and $20,000 for damages to its coal plant " as a whole," which the commissioners deemed to embrace the use of the premises across South street from the bulkhead as a coal yard in connection with the bulkhead rights. The other appellants owned in different proportions the other three parcels, consisting of Pier Old No. 49, East river, and wharfage and bulkhead rights appurtenant to twenty-nine and three-tenths feet of bulkhead adjoining said pier on the west and to thirty-one and forty-six one-hundredths feet adjoining it on the east, the value· of which was estimated as a whole and a single award of $250,000 was made therefor.

The learned court at Special Term was of opinion that the coal company was not entitled to any award for damages to its plant and that the awards to it and to the other appellants for bulkhead rights were not confined to bulkhead rights as stated in the report, but were erroneously made for interests in the street as well, and on those grounds refused to confirm the report and remitted the matter to new commissioners. I am of opinion that the learned court was right in holding that

the coal company was not entitled to an award for damages to its plant but was in error in holding that the awards for bulkhead rights embraced awards for interests in the street. This error was doubtless owing to general statements in the opinion of the commissioners, but when their opinion is construed in the light of the petition and of the evidence and of their report, it is quite evident that they made the award for the bulkhead rights, which embraces wharfage and cranage rights only, upon the proper theory. The petition described the bulkhead rights sought to be acquired, not by metes and bounds embracing any part of the street, but by a single line a specified number of feet in length along the outer or southerly line of South street, and the evidence was directed to the value of the bulkhead rights only without consideration of any right or interest in the street. The bulkhead rights of the coal company are only a few hundred feet westerly of the pier. All of the awards therefor are for property in the same immediate vicinity. With respect to the bulkhead rights an expert for the coal company testified that the wharfage and cranage rights on that part of the bulkhead were worth $400 per lineal foot, but his testimony indicates that he included in his estimate the right of the company to use these rights itself in connection with its plant. The expert for the city testified that they were worth $200 per lineal foot, and he excluded from consideration any right on the part of the company to use these rights itself in connection with its plant. The award shows that the commissioners allowed $300 per lineal foot, and from the fact that they made a separate award for damages to the plant as a whole, it is to be inferred that in determining the amount of the award for the bulkhead rights they did not take into consideration any right to use the same in connection with the plant. The expert for the other appellants testified that their bulkhead rights were worth $500 per lineal foot, and the expert for the city admitted that those bulkhead rights were worth $250 per lineal foot. It appears by the briefs that the coal company is satisfied with the award for the bulkhead rights. A separate award having been made therefor and on the proper theory and there being evidence to sustain it, the court should have confirmed it.

South street was seventy feet in width. It was evidently constructed pursuant to a grant from the city to one Rutgers on the 1st day of May, 1817, of land under the waters of East river. The outer line of the grant, as shown by the description and by a map annexed to the grant, was on the northerly or inner line of South street. The grantee covenanted to construct a " good and sufficient firm wharf or street " being the new street called South street for its entire width of seventy feet outside the premises conveyed and forever thereafter to maintain it as his own cost, and he agreed that the street as thus constructed should forever thereafter continue to be and remain a public street or highway the same as other public wharves or streets, and in consideration of his covenants the city agreed that he and his heirs or assigns should forever thereafter " fully have, enjoy, take and hold to his and their own proper use all manner of wharfage, cranage, advantages and emoluments, growing or accruing by or from that part of the said wharf or street called South street which lies opposite to the hereby granted premises and fronting on the East River," excepting such part thereof as might thereafter be appropriated for a public slip or basin. The wharfage and cranage rights are incorporeal rights, under which the owner has the exclusive right to collect the established rate of wharfage and cranage of vessels loading or unloading at the bulkhead. (*Kingsland* v. *Mayor, etc.,* 110 N. Y. 569; *Langdon* v. *Mayor,* 133 id. 628.) The coal company acquired the premises on the inner side of South street opposite the bulkhead, and in 1906 erected thereon coal pockets fifty feet in height with driveways on either side, which together with an office and stable substantially covered the premises. It erected at about the same time a movable house or structure on six railroad wheels on the street at the bulkhead, which could be but was not run on tracks, and on it placed a steam shovel or open grab buckets on an endless chain and a large boiler and forty-five horse power engine to operate the shovel. By these appliances coal was conveyed from boats moored at the bulkhead to a hopper on said house from which it was dropped into carts underneath and was then transported across the street and dumped into like hoppers on the company's plant where it was elevated

into the coal pockets by like endless chain conveyors. It appears that on the 18th of June, 1891, the board of docks authorized the erection of a derrick mast on the bulkhead to be maintained during the pleasure of the board. It does not appear whether or not such a mast was erected, but on the 9th of September, 1905, the board, by resolution, authorized the *substitution* of a new portable engine for *the* old hoister, which it is recited was then on the bulkhead, to be maintained during the pleasure of the commissioners. These permits were not revoked other than by the ouster of the company from the use of the portable house on the 18th of June, 1914; but that was after the city had acquired title in this proceeding on the fifth of the same month.

The city contends that the permits were invalid and that the house was a nuisance. The contention is made on the theory that South street was a public street and not a marginal street or wharf and that the jurisdiction over the street was vested in the president of the borough and the board of aldermen and that the jurisdiction of the commissioner of docks was confined to the wharf part of a widened exterior street or of a new exterior street, which would be marginal wharfs. In my opinion that contention is sound. The dock department through the commissioner of docks and the dockmasters was authorized to regulate the use of the bulkhead rights; but that power was confined to regulating the use of the wharves by vessels receiving and discharging cargoes thereat and to fixing wharfage rates. (Greater N. Y. Charter [Laws of 1901, chap. 466], §§ 867, 825, as amd. by Laws of 1902, chap. 609. See, also, Id. § 818, as amd. by Laws of 1904, chap. 741; Id. § 833.) The condemnation commissioners recognized that the company had no greater rights than any other abutting owner, but they were of opinion that since the wharfage rights were used in connection with the plant across the street they were used in common with the plant and that the company was entitled to an award for damages to the plant. In making the award they attempted to follow *Matter of City of New York* [*Erie Railroad Co.*] (193 N. Y. 117; 214 id. 387). In that case, however, the railroad had leased a bulkhead and premises across Thirteenth avenue therefrom for a freight yard from the same owner and on the institution of the

condemnation proceeding had released to its landlord all claims to an award for the wharfage or bulkhead rights.   The railroad company had, however, before the condemnation proceedings were instituted, erected and maintained a platform and floating bridge attached to the bulkhead under a revocation permit from the city and had constructed three tracks across the avenue under a like permit by which the structures at the water front were connected with the freight yard, and it had equipped its freight yard by laying tracks and the erection of structures thereon and otherwise, for use in connection therewith, all of which had become practically useless by the appropriation of the bulkhead rights.   The permit for the construction and use of the tracks across the avenue was lawfully granted and had not been revoked.   On that ground the Court of Appeals held that the award should be made for the bulkhead rights and damages to the plant across the avenue therefrom in so far as they were used together as one plant, on the theory that they constituted a single plant, the award, however, to be divided according to the respective rights of the parties thereto.   The decision of the Court of Appeals in that case does not sustain the right of the coal company to an award for damages to its plant, for here there was no physical connection between the bulkhead and the property across the street duly authorized by the city, as in that case.

Counsel for the city further contends that the commissioners have allowed the coal company for damages to the movable structure and appurtenances in the street.   Evidence with respect to the value thereof was received, but it is evident that if there was any award therefor, it is included in the award for the damages to the plant, and in no manner affects the award for the bulkhead rights.   I am of opinion, therefore, that the learned Special Term was right in holding that the coal company was not entitled to an award for damages to its plant, but should have confirmed the award to it for bulkhead rights, for while the evidence with respect thereto is not very satisfactory, the case is one of great hardship to the coal company which has expended a very large amount of money in so equipping its plant in the expec-

tation that it would be permitted to continue to enjoy the use thereof in connection with the bulkhead rights; and there is much force in the contention that the city has not exercised its power of eminent domain in the case at bar in good faith towards the coal company, since it appears that prior to instituting the condemnation proceeding it had leased most of the bulkhead rights sought to be acquired in this proceeding to the New York, New Haven and Hartford Railroad Company for a period of ten years with the privilege of two renewals of a like period each, and the lessee had agreed to pay the cost and expenses of acquiring this property either by purchase or condemnation, which is an additional reason why the court should not be technical in reviewing the weight of the evidence with respect to the amount of the award for bulkhead rights. The observations already made meet all arguments to the effect that the commissioners erroneously considered the extent of the bulkhead rights.

The city further contends that the commissioners erred in refusing to specify in answer to its request evidently made after the preliminary awards were made, whether they had made an award for the pier as it existed of the width of 35.1 feet at the inner line and 35.2 at the outer line and of the length of 325 feet on the southerly line and 326.4 feet on the northerly line, or in accordance with the only outstanding permits for the construction of the pier as shown by the records, which were for a pier 30 feet in width and 313 feet in length. It appears that the pier has remained of its present width and length since 1860. In the petition the pier was described as of its present width and length and it was stated generally that the city was desirous of acquiring all rights in and to the same not already owned by it. The commissioners state in their report that they considered the outstanding permits and made the awards accordingly. I think the fair construction of their report is that they did not consider the additional length and width of the pier; but I am of opinion that the owners were entitled to an award for the pier as it existed and has been used by them and their predecessors for a period of upwards of fifty years. The city was authorized to permit the widening and lengthening of the pier and having acquiesced in the improvement in that regard

for such a length of time it should not be heard to say in this condemnation proceeding that only the part of the pier for the construction of which permits were shown, constituted the lawful structure. Moreover, the city's expert considered that the additional width added no value to the pier as an unshedded pier, and there is no evidence other than may be inferred from that testimony that it added any value to it as a shedded pier or with respect to the amount thereof.

The main contention of the city on the appeal with respect to the pier and the adjacent bulkhead rights is that the award was made on the erroneous theory that it was a shedded pier. It appears, however, that it was a shedded pier, and that the permit for shedding it, which concededly was granted on the 24th of December, 1879, had not been revoked. It is recited in the permit that it was granted during the pleasure of the board. It is claimed, however, that the permit was duly revoked pursuant to the provisions of section 844 of the charter, which provided that such a permit shall not be revoked without the consent in writing of the mayor and of the commissioners of the sinking fund after the licensee shall have been duly heard, and which declared all sheds theretofore lawfully erected to be lawful structures. The only notice of a hearing with respect to the revocation of the permit was to the Central Vermont Railroad Company, a foreign corporation, the original licensee of the permit, which was the lessee of the premises at the time, whose lease thereof had long before expired, so that it had no interest therein. The notice was not served on any officer or agent of the company, but on one Hasbrouck, who had been designated by it under our statute * for the service of process on the corporation in this State. Manifestly that notice was insufficient, even as against the original lessee; but the city authorities were well aware of the fact that these appellants were in possession of the pier at the time and had long been in possession thereof claiming and exercising the right to maintain the shed thereon, and were the only parties who were directly interested, and yet no notice was

---

* See Gen. Corp. Law (Gen. Laws, chap. 35; Laws of 1892, chap. 687), § 16; Code Civ. Proc. (Laws of 1876, chap. 448), § 432, subd. 2.— [REP.

given to them. No one appeared on the hearing with respect to the revocation, but in form the permit was revoked in 1913. It is quite clear, I think, that that attempted revocation was a nullity. The structure having been erected under a lawful permit and having been declared by the Legislature to be a lawful structure and the permit being subject to revocation only, if at all, after notice and a hearing, the commissioners were right in making the award on the theory that the pier was a shedded pier. That the authority to revoke was exercised arbitrarily and solely with a view to reducing the award to be made in the condemnation proceeding is shown by the fact that the pier was thereafter leased to the railroad company as a shedded pier. The authority to revoke could only be exercised in any event when the public interest required it. The only real question is whether the award should have been made on the theory that the permit was revocable or on the theory that it was irrevocable. That is a question that perhaps has not been finally authoritatively decided with respect to such a permit as this, which contained no condition such as that the holder in the event of condemnation should claim no award on account of the permit but merely the recital that it was subject to the pleasure of the commissioner. (See *Matter of City of New York* [*Piers Old Nos. 19 & 20*], 117 App. Div. 553; *Matter of City of New York* [*Pier Old No. 15*], 95 id. 501; 113 id. 903; affd., 185 N. Y. 607; *Matter of City of New York* [*Piers Old Nos. 16 & 17*], 138 App. Div. 186; affd., 199 N. Y. 570; *Matter of City of New York* [*Pier Old No. 11, East River*], 124 App. Div. 465; affd., 192 N. Y. 539; *Kingsland* v. *Mayor, etc.*, 45 Hun, 198; affd., 110 N. Y. 569.) In the circumstances we do not deem it necessary to decide that point for that contention was not made on the hearing when the testimony bearing on this question was received. The city's only contention then appears to have been that the permit had been duly revoked. We cannot say in the absence of evidence on the point that there is any substantial difference between the value of an irrevocable permit and one revocable only after notice and a hearing and when the public interests require it, for such an occasion for revocation would seldom arise and in a hard case for the claimants, such as this is, for the reasons stated, we

are not inclined to be technical in reviewing the award and in that we have the authority of the Court of Appeals decision in the *Erie Railroad* case cited, where the permit to lay the tracks across the street was revocable but had not been revoked. The award for parcels " B," " C " and " D " is not excessive, and it is amply sustained by the evidence. The awards, therefore, should have been confirmed.

It follows that the order should be reversed with separate bills of costs to the appellants and the report of the commissioners confirmed as made, with the exception of the award to the coal company for damages to its plant, as to which confirmation should be denied.

CLARKE, P. J., DOWLING and SMITH, JJ., concurred; SHEARN, J., dissented in part.

SHEARN, J. (dissenting in part):

I concur in the opinion of Mr. Justice LAUGHLIN except in so far as it holds that the Muhlenberg Coal Company was not entitled to an award for damages to its plant.

It is recognized that the denial of compensation to the coal company for the destruction of its business is inequitable and works a manifest injustice. While Mr. Justice LAUGHLIN states in his opinion that " the case is one of great hardship to the coal company " and that " there is much. force in the contention that the city has not exercised its power of eminent domain in the case at bar in good faith towards the coal company " and that these are reasons " why the court should not be technical in reviewing the weight of the evidence with respect to the amount of the award for bulkhead rights," a brief statement of the facts will show how grievously the claimant has been injured.

One circumstance should be emphasized at the outset. It was the coal company's predecessor in title to the upland who, in consideration of a grant extending to what is now the inner line of South street, covenanted to and did construct along the water front of the upland a " good and sufficient firm wharf or street," which is the public way, wharf or street now known as South street. This wharf or street was forever thereafter to be maintained at the cost

First Department, December, 1918. [Vol. 185.

of the grantee, who was, in consideration of his covenants, to have and enjoy all manner of " wharfage, cranage, advantages and emoluments growing or accruing by or from that part of the said wharf or street called South street which lies opposite to the hereby granted premises." In covenanting to build and forever after to maintain this public wharf or street, it cannot be doubted that a material consideration in the mind of the grantee was the valuable uses to which his property, abutting on this public wharf or street, could be put in the future, by reason of the great convenience in having vessels able to lie alongside the bulkhead and discharge and take on cargoes not only immediately in front of warehouses, factories and buildings that might be erected along the inner line of this public wharf or street, but only seventy feet distant therefrom. This very use and development of the upland followed, and the Muhlenberg Coal Company established itself in the coal business and carried on this business at the premises 281, 282 and 283 South street and on the bulkhead immediately opposite. Mr. Justice LAUGHLIN has described the construction and general nature of this coal plant. The structural value of the coal pockets and machinery was between $31,000 and $32,000. The building and its machinery, the fixtures and the appurtenances were built, installed and used with the bulkhead for over twenty-two years as one plant for the retail coal business. From October first to April fifteenth in every year the coal company had five coal barges continually unloading at the bulkhead and from April fifteenth to October first one or two barges. During the whole period of twenty-two years it unloaded coal daily from its bulkhead, seventy feet from its pockets. The business was what is known as " a waterfront coal yard." The plant was located in a very populous neighborhood and its average annual net profit for the seven years immediately preceding the taking of its bulkhead was $3,481.02, on average sales of 43,403 tons a year, making an average net profit of $.0802 per ton. The average cost per ton for handling coal from boats at the bulkhead to the pockets of the company for the five years beginning April 1, 1909, was $.0819, and in the five years of 1910 to 1914 inclusive was $.0799. When its bulkhead was taken, the

nearest berth that it could procure for its coal barges was on Pier New 36, East river, 450 feet from its coal pockets. It now had a long haul for its coal, and instead of having a water-front coal yard, was transformed into "an inland coal yard." The testimony shows that an inland coal yard cannot now be established and profitably run in the borough of Manhattan. The cost of unloading from the present berth to the pockets is $.1817, or an excess of $.1018 per ton over the average cost in the five years of 1910 to 1914. As the average net profit was only $.0802 per ton, the business can no longer be profitably conducted and is being liquidated. Thus the taking of the bulkhead has destroyed a profitable and long-established business, which business is of the kind that might readily have been anticipated as a profitable use of the upland by the original grantee, who undertook to build and maintain the public wharf or street for the bulkhead rights which have now been taken from the owners of the property.

The situation is aggravated by what moved the city authorities to recommend taking from the coal company these bulkhead rights. It was because the New York, New Haven and Hartford Railroad Company wished to acquire fifty-five and eighty-one one-hundredths feet of the Muhlenberg bulkhead under a lease from the city, thus "making such handling [of freight] less expensive than under the present conditions, which entail upon the company oftentimes quite an expense for drayage." In other words, to save the railroad company "quite an expense for drayage," the coal company was driven out of business because of the additional expense for drayage upon it by the ouster. By the terms of the lease of the bulkhead to the railroad company, that company is required to defray the entire cost and expenses of this proceeding and pay the awards. Thus, in the last analysis, to hold that the coal company is entitled to no award for damages to its plant simply means that the railroad company is relieved from the burden of paying the damage which it has, in order to save itself "quite an expense for drayage," caused to be inflicted upon the coal company. Furthermore, by inexplicable indifference to the hardship inflicted upon the coal company for the benefit of the railroad company, the city authorities unnecessarily added to the damage. The railroad company

did not require and did not lease all of the bulkhead, and on June 8, 1914, the attorneys for the claimant wrote to the department of docks, apprising the city of the situation which would follow from taking the Muhlenberg bulkhead, and requested a lease, upon the usual terms, of seventeen feet of the bulkhead which was not taken by the railroad, and of the bulkhead belonging to the city immediately adjoining the property taken. The city paid no attention whatever to the communication until December, 1914, at which time the department of docks was not in a position to make any definite offer of a lease.

These facts show that we are dealing with a real grievance and that the taking of the bulkhead rights has undoubtedly destroyed the claimant's business and rendered its plant practically worthless. It seems to me that, both on principle and precedent, there is escape from sanctioning the manifest injustice of denying compensation for the injury done. " Constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance." (*Boyd* v. *United States*, 116 U. S. 616, 635.) " The right to take private property by eminent domain is coupled with the constitutional limitation that it can only be so taken upon just compensation." (*Matter of City of New York* [*North River Waterfront*], 120 App. Div. 849, 855.) " Just compensation is reasonable and adequate compensation and the equivalent for the actual loss that the owner sustains by reason of the public taking his private property." (*County of Erie* v. *Fridenberg*, 221 N. Y. 389, 393.) " There is no reason why the citizen, whose land is taken *in invitum*, should suffer any financial loss that may be prevented by awarding him proximate and consequential damages." (*South Buffalo R. Co.* v. *Kirkover*, 176 N. Y. 301, 306.)

To my mind, the situation is so fairly akin to that in *Matter of City of New York* [*Erie Railroad Co.*] (193 N. Y. 117) where the Court of Appeals upheld an award for damages done to the railroad's structures in a freight yard across a city street, upon the other side of which the railroad enjoyed bulkhead rights, that a precedent is afforded enabling us,

under the broad principles above stated, to do full justice to the claimant. The facts in that case are stated by Mr. Justice LAUGHLIN and need not be repeated. Finding that the railroad company used the bulkhead and the freight yards " ' as one plant, neither portion of which would have been of substantial value without the other, and this interdependence of each part upon the other was not affected by the circumstance that the two parcels were separated by Thirteenth avenue, so long as the city's permit to maintain connecting tracks * * * remained unrevoked, as it did up to the time that the city acquired title to the bulkhead,' " the court allowed compensation under the general rule, of which, as the court said: " *South Buffalo Ry. Co.* v. *Kirkover* (176 N. Y. 301) and *Bohm* v. *Metropolitan El. Ry. Co.* (129 N. Y. 576) are fair illustrations." The only important difference between the *Erie Railroad* case and this, as pointed out by Mr. Justice LAUGHLIN, is that in the *Erie Railroad* case there were railroad tracks between the bulkhead and the freight yard, which, it is said, constituted a physical connection between the parts of the plant on the opposite sides of the avenue. I cannot believe that the Court of Appeals allowed compensation for the damage done in that case simply because there were railroad tracks laid across the avenue. In the nature of things, because of the weight of the vehicles and their loads, the railroad company had to employ rails to move its carloads into the freight yard across the avenue from the bulkhead. In this case, the loads being smaller, the claimant was enabled to move its loads to the coal pockets across the street from the bulkhead in vehicles whose wheels did not have to run on tracks. The plant from the bulkhead to the coal pockets was no less a unit because the wheels of the vehicles crossing the street ran on the pavement instead of upon rails. On the theory that physical connection was the important thing, if this coal company had carried its coal from the bulkhead to the pockets in an endless chain of buckets running over an elevated track above the roadbed, maintained under a revocable license issued by the city, compensation could be had in this case because the coal pockets would be physically connected with the bulkhead. It does not seem to me that the right to compensation depends upon the mere manner of communica-

tion or physical connection between the parts of the plant on opposite sides of the street, but rather upon the fact that the plant on both sides of the street is an entirety, necessarily operated as a unit, either part being practically worthless without the other. The situation for the claimant in this case seems to me to be stronger than in the *Erie Railroad* case, for here the claimant's predecessor in title built and maintained the public wharf or street on which the property abutted, and partly in consideration for the bulkhead rights on the water side. I am, therefore, of the opinion that the commissioners were warranted in awarding damages for injury to the coal company's plant.

But the damages awarded were very inadequate. The commissioners found that $20,000 represented " the difference between the value of the plant as it was before the bulkhead was taken, and its value after it was taken." How this figure was arrived at was not stated. The commissioners did find, however, that an interior coal yard could not be run in the city of New York at a profit. The commissioners, therefore, necessarily found that the coal company's business was destroyed. As above pointed out, the business had long been a profitable one and its average annual profits for the seven years preceding the taking of the bulkhead was $3,481.02. Twenty thousand dollars invested at five per cent would produce only $1,000 a year. It seems obvious that the value of the business as a going concern, to which the claimant was entitled and which the taking destroyed, was greatly in excess of $20,000. In addition, the claimant was entitled to the difference in the value of the coal pockets as they were before the bulkhead was taken and after it was taken. They cost $31,000, and while the commissioners did not " believe that they became valueless," they said, " We entertain no doubt that their value was decidedly lessened."

The order should be reversed, with separate bills of costs to the appellants, and the report of the commissioners confirmed as made, with the exception of the award to the Muhlenberg Coal Company for damages to its plant, as to which the report of the commissioners should be returned to them for the purpose of fixing damages in accordance with the foregoing views.

Order reversed, with separate bills of costs to the appellants, and report of commissioners confirmed as made, except as to award to Muhlenberg Coal Company for damages to its plant, as to which confirmation is denied. Order to be settled on notice.