**John J. KING, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

No. 23637.

United States Court of Appeals
Fifth Circuit.

July 29, 1966.

William C. Garrett, Charles F. Hawkins, Eugene R. Lyerly, Kilgore & Kilgore, Dallas, Tex., for appellant.

B. H. Timmins, Jr., Asst. U. S. Atty., James F. Gaulding, Asst. Regional Counsel, I. R. S., Melvin M. Diggs, U. S. Atty., Dallas, Tex., for appellee.

Before TUTTLE, Chief Judge, and BROWN and COLEMAN, Circuit Judges.

TUTTLE, Chief Judge:

The United States Government is entitled to retain possession and permanent title to the rifle and pistol that were found by the Warren Commission to have been used in the tragic killing of President Kennedy and Dallas Police Officer Tippit. The question before us on this appeal is whether the government may obtain such title by forfeiture, without compensation to the owner, or must resort to condemnation by the exercise of eminent domain, in which event the owners must be compensated.

It would certainly be convenient and it would tend to hasten the termination of of what must appear to many to be a very distressful bit of litigation were we able to accept the government's present theory and affirm the trial court's judgment forfeiting the weapons to the United States as a species of Deodands.[1]

1. "A thing which, because it had been the immediate cause of the death of a person, was given to God, that is, forfeited to the crown to be applied to pious uses." Webster's New International Dictionary.

We conclude, however, that it would strain the fabric of the law beyond repair were we to accept the theory which the government propounds to achieve this result.

The United States contends that the dealers who sold the weapons to Oswald were required by the Federal Firearms Act to keep correct records of all sales (with criminal sanctions for violations); that Oswald bought the weapons by use of a fictitious name (Hidell); that he, therefore, "caused" the dealer to keep false records; that the Federal statute provides that: "any firearms * * * involved in any violation of the provisions of * * * [the Firearms Act] or any rules or regulations promulgated thereunder shall be subject to * * * forfeiture * * * "; these firearms were "involved" in a violation of the record keeping regulations promulgated under the Act; therefore, they were forfeit to the United States.

Our problem would be simple if the Federal Firearms Act expressly prohibited the ordering of firearms from dealers by the use of false names. There is no such expressed prohibition.

The pertinent statutory and regulatory provisions are—

15 U.S.C.A. § 903(d):

Licensed dealers shall maintain such permanent records of importation, shipment, and other disposal of firearms * * * as the Secretary of the Treasury shall prescribe.

26 C.F.R. § 177.51:

Each licensed * * * dealer shall maintain complete and adequate records * * *. The records will show and include:

\* \* \* \* \* \*

(c) The disposition made of each firearm including the name and address of the person to whom sold and the date of disposition.

There is no provision in the Federal Firearms Act requiring a purchaser to use his true name when ordering weapons from a dealer licensed under the Act. It may be argued, though tenuously, that upon the authority of Walker v. United States, 192 F.2d 47 (10th Cir. 1951), Oswald could have been punished for his use of a fictitious name under 18 U.S.C.A. § 1001, which prohibits the knowing and willful making of false or fraudulent representations in any matter within the jurisdiction of an agency or department of the United States. But this is of no moment here, for to sustain its claim of forfeiture, the government is obliged to prove a violation of the Firearms Act, in order to bring the case within the ambit of 15 U.S.C.A. § 905(b), which provides:

Any firearm * * * involved in any violation of the provisions of * * * [the Federal Firearms Act] or any rules or regulations promulgated thereunder shall be subject to seizure and forfeiture * * *.

The first requisite under this forfeiture statute is that a violation of this particular Act be established. A second essential element is that firearms sought to be forfeited be "involved in" the violation. Appellant's briefs raise substantial doubt that § 905(b) should be construed to encompass a firearm with respect to which no more "involvement" can be shown than that it was the subject of a violation of the record-keeping requirements imposed upon dealers. If the statutory language *"any* violation" were to be literally applied, then a dealers failure to post the record of a transaction by the close of business of the day following shipment (as required by 26 C.F.R. § 177.51) would result in a forfeiture of the firearms "involved" in the transaction even though the purchaser was wholly innocent of any default. It would strain the rules of construction to the breaking point for us to give this language the effect sought for it here. However, we need not decide this issue because of the graver question whether there was any violation of the statute.

With respect to that question, the government contends that Oswald's failure to use his own name in ordering the weapons, when combined with the subsequent entry in the dealer's records of

the pseudonyms he did use, resulted in violations of § 903(d) of the Act (quoted above). The court below accepted this position, stating that "This [the applicable regulation, 26 C.F.R. § 177.51] means, of course, the name by which the purchaser could be identified, not a fictitious name which would not disclose but would conceal his identity." As authority for this proposition, the government abstracts the following passage from Hensley v. United States, 171 F.2d 78 (9 Cir. 1948):

> "It cannot be said that the law (as here) may require certain important and pertinent information to be entered on a prescribed form for the use of a public official in aid of law enforcement, but must tolerate such information when it is false." Id. at 82.

The context in which this statement was made has an important bearing upon its contribution to the solution of this case. In the *Hensley* case, the defendants were wholesale liquor dealers convicted under indictments charging *them* with willfully making false entries in required records with respect to the names and addresses of persons to whom *they* shipped distilled spirits. On appeal from their convictions, the defendants asserted that they were not required to give names and addresses, because the form calling for that information exceeded the power granted the Commissioner of Internal Revenue under the applicable statute. The Court of Appeals upheld the Commissioner's authority and sustained the convictions. Its comment relating to false information (quoted above) was directed to the facts of the case before it, in which the jury necessarily found that wholesale liquor dealers had willfully and deliberately falsified records which *they* were required to keep, by reporting therein that stated quantities of liquor had been sent to certain named parties at given addresses—when *in fact* some other disposition of the liquor had been made by *them*.

Bearing in mind that there is no requirement in the Federal Firearms Act that a *purchaser* use his true name, there is some doubt whether the *Hensley* decision can have any application whatever to the facts of the case before this Court. In an important sense, the information reflected in the records of the firearms dealers in this case cannot be deemed false at all. The pertinent regulation requires recordation of the name and address of the person to whom a firearm is sold. The weapons here were *in fact* addressed to "A. Hidell," or "A. J. Hidell," and these names were recorded in the appropriate records. Can it be said that the dealers, even if they had had knowledge that a false name had been used in the order, would have been at liberty under the regulation to record the name "Oswald" instead of "Hidell," when in fact the shipment was addressed to the latter? Here the absence of a prohibition in the Act against the use of pseudonyms by purchasers takes on an especial significance. If the use of a pseudonym (or, to give it the more sinister characterization, a "fictitious" name) is not unlawful in the first instance, then by what chameleonic process is its entry upon a dealer's records transformed into a crime, when the entry correctly reflects the actual facts of the shipment?

Cases construing the Act have said that its purpose is to prevent the transportation and possession of firearms by criminals who, by their past conduct, have demonstrated their unfitness to be trusted with them. Cases v. United States, 131 F.2d 916 (1 Cir. 1942); United States v. Platt, 31 F.Supp. 788 (S.D.Tex. 1940). That purpose is translated into law in § 902 of the Act. Under the provisions of that section, any member of the specified class of convicted criminals, fugitives from justice, or indicted suspects, who engages in or causes interstate or foreign commerce in any firearm, or receives any firearm which has been transported in such commerce, is guilty of a crime no matter what name or pseudonym he may use in ordering or purchasing the weapon. Had Congress deemed it necessary to the effective administration of the Act that all pur-

chasers use their correct names in ordering firearms it could, and should, have enacted a statute to that effect. The imposition of such a requirement upon *purchasers* through an inference drawn from a record-keeping obligation imposed upon *licensed dealers* would seem to transgress the permissible limits of judicial construction.

Assuming, however, for the purposes of this discussion that § 903(d) *could* be violated by the entry of a false name in the records required to be kept thereunder, the narrower question is presented whether the evidence sustains the trial court's determination that such a violation occurred in this case. The answer to this question depends upon the proper interpretation of 18 U.S.C.A. § 2, which provides:

§ 2. Principals.

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Analysis of § 2(a) reveals that two distinct elements are embodied therein. First, whoever *directly commits* an offense is punishable as a principal. Second, whoever aids, abets, counsels, commands, induces or procures another to commit an offense is likewise punishable as a principal. This analysis is based upon the following excerpts from the Reviser's Note to § 2:

The section as revised makes clear the legislative intent to punish as a principal * * * one who *directly commits* an offense and one who "aids, abets, counsels, commands, induces or procures" *another* to commit an offense * * *. (Emphasis added).

It is clear that Oswald did not *directly* (in the literal sense) commit an offense under § 903(d), for we have seen that the statute imposed no direct responsibility

upon him as a purchaser for the maintenance of the required records. It is equally clear that Oswald did not aid, abet, etc., *another* to *commit an offense*. The principle that one cannot be guilty of aiding and abetting the commission of an offense unless another person has committed a criminal violation seems well-reasoned. It is also well-supported by authority. E. g., Shuttlesworth v. City of Birmingham, 373 U.S. 262, 83 S.Ct. 1130, 10 L.Ed.2d 335 (1963); Edwards v. United States, 286 F.2d 681 (5 Cir. 1960). If anyone was guilty of a violation of the Act in this case, it was Oswald. The dealers certainly committed no crime for they had no knowledge or reason to suspect that the name "Hidell" was a pseudonym, and the government concedes as much in its brief. It would seem anomalous at best to hold that Oswald was punishable as an "aider and abettor" in the absence of any showing that another person committed an offense. Thus it is apparent that Oswald was not within either of the two classes intended to be embraced within § 2(a).

There are, of course, many instances in which violations of the law are brought about by one who intentionally causes another to unwittingly perform the prohibited act. Prior to the addition of § 2(b) in the 1948 revision of the Criminal Code, the courts experienced some difficulty in determining whether such a person was punishable. Such a situation was presented in United States v. Giles, 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493 (1937). The defendant was an employee of a National Bank. He was indicted under a statute which made it a crime for any such employee to make a false entry in the books of such a bank with intent to defraud. Giles had covered up a shortage in his cash by withholding deposit slips, which resulted in the making of incorrect entries in the books of the bank. The indictment charged that the defendant did "unlawfully, knowingly, willfully, fraudulently, and feloniously make and *cause to be made*" specified false entries. He admitted that his purpose in withholding the deposit tickets was to prevent

the discovery of his shortage, but contended that he had not committed a crime against the United States because he had not *made* the prohibited entries. The Court of Appeals reversed the conviction, on the ground that the statute would not support an indictment that the defendant *caused* the false entries to be made, saying:

> The evidence in the record conclusively shows that defendant neither made the false entries nor did anything that could be considered as a direction to the bookkeeper to make them. Without the charge that he caused the entries to be made he could not have been convicted. Id. at 47, 57 S.Ct. at 343.

The Supreme Court disagreed with this interpretation of the law. In reversing, the Court quoted the following passage from a dissenting opinion in the Court of Appeals:

> "This statute plainly intends to punish the falsification of bank records with intent to deceive or defraud. If false entries are *deliberately produced,* although through an ignorantly [sic] innocent agent, the bank employee who *concocts the plan and achieves the result* is, in my opinion, guilty. This innocent bookkeeper was the teller's real though unconscious agent in making the entries; as truly so as if the false entries had been requested in words."
> " * * * [t]he present case is not one of a mere failure to prevent a consequence, *but is one of contriving that consequence* and so farthering it as to make it wholly the contriver's own. The bookkeeper in making these false entries was doing the will of the teller, though he did not know it. The false entries are in law the acts of the teller who *planned them and did all he needed to do to produce them."* Id. at 47–48, 57 S.Ct. at 344. (Emphasis added.)

In conclusion, the Supreme Court stated: "The record leaves us in no doubt that the *false entries* on the ledger were the *intended* and necessary result of respondent's deliberate action in withholding the deposit tickets. Within the stat-

ute he made them." Id. at 49, 57 S.Ct. at 344. (Emphasis added.)

The rule established in *Giles* is codified in § 2(b). The Reviser's Note to § 2 states:

> The section as revised makes clear the legislative intent to punish as a principal * * * anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States.

> It removes all doubt that one who puts in motion * * * the illegal enterprise or causes the commission of an indispensable element of the offense by an innocent agent or instrumentality is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense.

> This accords with the following decisions: * * * United States v. Giles * * *.

The trial court here concluded that Oswald violated 15 U.S.C. § 903(d) in that he *willfully caused* the firearm's dealers to enter fictitious names in their records, within the meaning of § 2(b). The court stated that "An actor who commits an offense can be the 'real though unconscious agent' whose conviction is not a prerequisite to conviction of the one who causes the offense to be committed." As authority for this proposition, the court cited the *Giles* case and Walker v. United States, 192 F.2d 47 (10 Cir. 1951). The citation to *Walker* seems wholly inapposite, since the defendant in that case was prosecuted under 18 U.S.C. § 1001 for *giving* false addresses in obtaining narcotics prescriptions—not for *causing* the physician and druggists to make false entries in their records.

Upon close inspection the attempted analogy to the *Giles* case is also faulty. Throughout the opinion in *Giles*, the Court continually emphasizes that the prohibited false entries were the *planned* and *intended* result of deliberate action which the *defendant* took in order to bring them about. He knew that unless the records were falsified his shortage

would be discovered, and so he contrived a scheme to *produce* the false entries. In contrast to this knowledge and purposive action, there is no showing in the record of this case that Oswald even knew that dealers were required to keep records. · Without such knowledge, it can not be said that he willfully caused anything with respect to those records.

The trial court's finding that Oswald intended "to make it appear that a person separate and apart from Oswald was the person to whom the firearms were sold" is a fair inference from the facts in the record. But such a finding will not support the conclusion that he *willfully caused* the making of a false entry, absent any evidence that he knew that an entry would be made. We might speculate that Oswald realized that the dealers would have business records such as invoices, etc., and used a fictitious name in placing his orders with the intent to prevent the tracing of the weapons to him. This, however, is not the intent which must be shown in order to prove that he willfully caused a violation of § 903(d) of the Firearms Act.

On the question of the intent required to be proved, the trial court made the following statement:

> In determining a defendant's intention, the law assumes that every person intends the natural consequences of his voluntary acts or omissions. Therefore, the intent required to be proven as an element of the crime is inferred from the defendant's *voluntary commission of the act forbidden by law*, or from his omission of the duty required by law, and it is not necessary to establish that the defendant knew that his act or omission was a violation of the law. United States v. One 6.5 mm. Mannlicher-Carcano Military Rifle, 250 F.Supp. 410, 412–13 (N.D.Tex.1966). (Emphasis supplied.)

This does not seem an appropriate standard to apply in this case. Presumably the trial court, by the italicized language, referred to the use of the fictitious names. But this was not an "act forbidden by law." Thus it would be exceedingly difficult to infer any criminal intent from the mere commission of that act. Some knowledge that its commission would result in a crime is essential in such circumstances. Second, it can hardly be said that the dealers' entries were a "natural consequence" of Oswald's acts, resulting as they did from a relatively obscure regulation promulgated by the Secretary of the Treasury, (of which few but the licensed dealers upon whom its burdens fall would have any knowledge).

In the context of a criminal statute, the word "causes" has a somewhat different meaning than that imparted to it in other areas of the law. The mere causal connection that might be sufficient to constitute proximate causation is not enough to impose criminal responsibility. The reason, of course, is that a criminal purpose or intent must accompany the causal nexus before conviction for a crime can be had. Some insight into the character of this element of intent can be gleaned from United States v. Peoni, 100 F.2d 401 (2 Cir. 1938). The defendant, Peoni, sold counterfeit currency to Regno, who sold it to Dorsey. All three knew that the currency was counterfeit. Peoni was prosecuted under the predecessor of 18 U.S.C. § 2(a), as an accessory to Dorsey's possession. Judge Learned Hand, after reviewing the history of the statute, stated:

> It will be observed that all these definitions have nothing whatever to do with the probability that the forbidden result would follow upon the accessory's conduct; and that they all demand that he in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed. All the words used—even the most colorless, "abet"—carry an implication of purposive attitude towards it. Id. at 402.

The Supreme Court quoted approvingly from Judge Hand's statement in Nye & Nissen v. United States, 336 U.S. 613, 69

S.Ct. 766, 93 L.Ed. 919 (1949). From this discussion, it can be seen that the mere fact that an act is "wrongful" (using a fictitious name for defective purposes), or even criminal (selling counterfeit currency), and is causally related to a subsequent criminal violation (making a false entry or possessing counterfeit money) does not make the actor guilty for that subsequent violation—unless the purposive intent can be shown. On the record before this Court, that necessary showing of purposive intent cannot be made, for there is no evidence to sustain a finding that Oswald had any knowledge of the record-keeping requirements imposed upon dealers under 15 U.S.C. § 903 (d).

The case perhaps most closely in point is Nicolopoulos v. United States, 332 F.2d 247 (1 Cir. 1964). There the defendant was indicted under § 2(g) of the Federal Firearms Act (15 U.S.C. § 902(g)) for *causing* the transportation of firearms in interstate commerce. The evidence showed that defendant knew that the guns were stolen when he agreed to buy them. But the trial court had not charged the jury that it was necessary to find that defendant had knowledge that the firearms would be transported across a state line. In reversing the conviction, the court stated:

> [U]nder this statute, whatever else may be required, it must be that "causing" interstate transportation requires knowledge on the part of the defendant, or, at least, reasonable grounds to know, that his conduct involves, or will result in, such commerce. [Citations omitted.] In an extended record we find no basis for a finding that the defendant had even reason to know that the two guns in question either had been or were to be so transported. Id. at 248. (Footnote omitted.)

Applying this test to the case at bar, there is no basis for a finding that Oswald knew or had reasonable grounds to know that the firearms dealers from whom he ordered the weapons here involved were required to keep records under 15 U.S.C. § 903(d), and that his use of a fictitious name would result in the making of a false entry therein. Absent such a showing, the lower court's finding that he willfully caused the Federal Firearms Act to be violated cannot stand. Since no violation of the Act was proved, the weapons are not subject to forfeiture, and the judgment of the District Court must be reversed.