John J. KING, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 67–C–518.

United States District Court

D. Colorado.

Nov. 8, 1968.

Holmberg & Poulson, James S. Holmberg, Denver, Colo., and Kilgore & Kilgore, William C. Garrett, Dallas, Tex., for plaintiff.

Lawrence M. Henry, U. S. Atty. for Dist. of Colorado, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

This is an action in which the plaintiff seeks to recover compensation from the United States, alleging that the latter took, pursuant to Public Law 89–318, 79 Stat. 1185, the rifle used in the slaying of President John F. Kennedy and the revolver used in the slaying of Officer J. D. Tippit. Plaintiff alleges that he was and is the owner of these weapons, and further alleges that the Attorney General of the United States, acting pursuant to the mentioned Public Law, published in the *Federal Register* a declaration vesting title in the weapons in the United States. Plaintiff seeks damages in the total amount of $5,000,000. The government has moved for summary judgment on a variety of grounds which will be described and discussed hereinafter.

The facts herein are not disputed. The findings of the President's Commission on the Assassination of President Kennedy, commonly called the Warren Commission, are taken as true by both sides in the case. Based upon the findings of the Warren Commission and other facts, plaintiff and defendant have filed a stipulation which covers most of the factual material relevant to this case. It is agreed that the weapons here at issue are those which were used by Oswald. The rifle was purchased from Klein's Sporting Goods Company, Chicago, Illinois, for $21.45, plus $7.17 for a telescopic sight. The revolver was purchased by Oswald in March 1963, from Seaport Traders, Inc., Los Angeles, California, for the sum of $29.95.

While in custody following his arrest, Oswald denied owning a rifle.

The weapons were delivered to the Federal Bureau of Investigation on November 22, 1963, for the purpose of conducting tests. Thereafter, these weapons were made a part of the record of the Warren Commission. During the period of November 22, 1963 to November 1966, the weapons were, for the most part, in the possession of the Warren Commission or the F.B.I. On November 8, 1966, they were delivered to the Administrator of General Services, Washington, D. C., in accordance with Public Law 89–318. A forfeiture suit was instituted by the government in Dallas on September 10, 1965, against both the rifle and the revolver. This action, however, failed, the Circuit Court holding that the alleged violation of the statute on which the forfeiture action was based was not sufficient under the terms of the statute. See King v. United States, 364 F.2d 235 (5th Cir. 1966).

The Act of Congress which has been referred to and on which this suit is based, which is designated Public Law 89–318, was effective November 2, 1965. This Statute declares that national interest requires that the United States acquire all right, title, and interest in certain items of evidence considered by the President's Commission on the Assassination of President Kennedy. The Attorney General is authorized to determine which items should be acquired and preserved. The Act goes on to provide that based on the Attorney General's determination and declaration, the item shall become vested in the United States. A further provision of the Statute vests the United States District Court for the district wherein the claimant resides with jurisdiction to hear and determine and render judgment on any claim seeking just compensation for items acquired by the United States.

Pursuant to the Statute and within the time provided, the Attorney General filed a declaration providing for the acquisition of the weapons here in suit. The plaintiff acquired his interest through Marina N. Oswald, widow of Lee Harvey Oswald. A Bill of Sale,

dated March 25, 1965, evidences this transaction. Marina N. Oswald acted individually and as administratrix of the estate of Lee Harvey Oswald. The Bill of Sale "bargains, sells, assigns, and conveys to buyer" all right, title and interest to the weapons. The buyer covenants not to cause or permit public exhibition during the lifetime of Marina N. Oswald. The Bill of Sale provided for $10,000 to be paid immediately, with the payment of an additional $35,000 to the estate in the event that the buyer succeeded in obtaining possession of the rifle. This latter undertaking (to pay an additional $35,000) was later voided in consideration of the payment of $10. A further contract modified the prohibition against public exhibition, permitting plaintiff to exhibit it outside the state in which Marina N. Oswald "is residing."

The contention of the government that the rifle was abandoned by Lee Harvey Oswald is based on the fact that approximately fifteen minutes after the assassination, the rifle was discovered on the sixth floor of the Texas Book Depository Building in Dallas, Texas. The government also contends that Marina Oswald made a gift of the rifle to the United States Government. This is based on the fact that she did not demand it when demanding other property from the Warren Commission and also on the fact that she expressed the intent in a letter to the Warren Commission to give it to the United States.

The defendant's motion is for summary judgment or in the alternative to limit the plaintiff's recovery to the stipulated replacement value. The government's contentions are:

1. The plaintiff has not acquired any property interest in the rifle because it was abandoned by Oswald at the scene of the assassination in 1963, and for the further reason that Marina Oswald made a gift to the United States of whatever interest may have remained in the rifle and that she did so prior to the purported assignment to King.

2. The government also contends that any interest that the plaintiff may have is unenforceable against the United States by reason of the Anti-Assignment of Claims Act, 31 U.S.C. § 203.

3. It is further contended that if the plaintiff has a compensable interest, the measure of compensation is limited to the sum of $51.40, the stipulated market value of the rifle and the revolver.

## I

### The Question of Possible Forfeiture

■ Under the peculiar facts of this case, one would suppose that under some principle of common law or at least natural law or natural justice, weapons used in the commission of a crime of this magnitude would be subject to forfeiture by the proper authorities and, certainly, that property of this character would not be subject to commercial traffic. It is, therefore, somewhat astonishing to discover that there is not any such principle and that forfeiture is a matter of statutory regulation.

Seemingly, the Court of Appeals for the Fifth Circuit had the same reaction in King v. United States, supra, wherein the Court noted that the United States Government is entitled to retain possession and permanent title of the rifle and revolver which were found by the Warren Commission to have been used "in the tragic killing of President Kennedy and Police Officer Tippit." The Court went on to say:

"The question before us on this appeal is whether the government may obtain such title by forfeiture, without compensation to the owner, or must resort to condemnation by the exercise of eminent domain, in which event the owners must be compensated." 364 F.2d at 235.

It was concluded that the forfeiture route was not available to the government, thus, requiring condemnation.[1]

---

1. The Court noted in passing:
    "It would certainly be convenient and it would tend to hasten the termina-

tion of what must appear to many to be a very distressful bit of litigation were we able to accept the government's

■ Forfeiture is quite different from condemnation in that the latter requires the payment of just compensation. United States v. One 1962 Ford Thunderbird, 232 F.Supp. 1019, 1022 (N.D.Ill. 1964), and 37 C.J.S. Forfeiture § 4.

■ Although there may be such a thing as judicial forfeiture, it does not occur until there has been a conviction and the court has decreed that the property of the person convicted is forfeited to the government. Furthermore, such a remedy would obtain only in respect to instruments of the crime and perhaps contraband. See 37 C.J.S. Forfeiture § 1 et seq.; 3 A.L.R.2d 738, §§ 1–2.

■ Statutory forfeiture on the other hand is a civil action which becomes effective as of the date of the act prohibited by the statute. United States v. Stowell, 133 U.S. 1, 16–17, 10 S.Ct. 244, 33 L.Ed. 555 (1890). A conviction is not a prerequisite. Judicial forfeiture has had little acceptance in the United States, and it is generally held that the remedy must be through statutory proceedings.[2]

■ Thus, in United States v. Lane Motor Co., 199 F.2d 495 (1952), aff'd, 344 U.S. 630, 73 S.Ct. 459, 97 L.Ed. 622, the Court of Appeals for the Tenth Circuit said:

"Proceedings of this kind instituted by the United States for the forfeiture of property are essentially statutory proceedings, and they cannot be maintained unless authorized by an applicable statute. United States v. Charles D. Kaier Co., 3 Cir., 61 F.2d 160."

199 F.2d at 496–497.

Therefore, we agree with the decision of the Circuit Court for the Fifth Circuit in King v. United States, supra, that the case is not a proper one for statutory forfeiture. There being no forfeiture nor other summary procedure and although the plaintiff's case is not one which commends itself from the standpoint of equity or natural justice, we are constrained to follow the law and hold that the basic authority in the case at bar is Public Law 89–318, wherein the Congress authorized plaintiff to seek just compensation in United States District Court in the District in which he resides.

II

*The Abandonment and Gift Questions*

■ The government's position is that the evidence so conclusively establishes that Oswald abandoned the rifle that there is not a remaining triable issue. Oswald's act of leaving the rifle on the sixth floor of the Texas Book Depository Building is a somewhat unequivocal act strongly indicating intent to abandon. On a previous occasion, however, according to the evidence, Oswald had secreted the weapon following an effort to shoot General Walker. Later he had returned to the scene and retrieved it. Since intent is an essential element and since state of mind is a question of fact, it would appear at this juncture at least

present theory and affirm the trial court's judgment forfeiting the weapons to the United States as a species of Deodands. ('A thing which, because it had been the immediate cause of the death of a person, was given to God, that is, forfeited to the crown to be applied to pious uses.' Webster's New International Dictionary.) We conclude, however, that it would strain the fabric of the law beyond repair were we to accept the theory which the government propounds to achieve this result."

364 F.2d at 235–236.

2. See 37 C.J.S. Forfeiture § 1 et seq.; 3 A.L.R.2d 738, §§ 1–2. It is interesting to note that Texas Penal Code, § 50, rules out forfeiture of the property of one executed or imprisoned for life. See also, § 51 which says: "When a convict is imprisoned in the penitentiary, his property shall be controlled as directed by law; but there shall in no criminal case be a forfeiture of property of any kind to the State."

that the issue is a factual one for a jury to determine.

■ The question of gift of the rifle to the United States by Mrs. Oswald is also a potential fact issue. This is complicated by the fact that Mrs. Oswald was not, at the time that she wrote the letter to the Warren Commission which expressed a donative intent, acting on behalf of the estate. Nevertheless, we are of the opinion that she was capable of making a gift of her interest and unless there is counterbalancing evidence, it would appear that she effectively made a gift of any interest that she had in the rifle to the government, and that there is not a triable issue of fact with respect to her donative intent. Inasmuch, however, as the case is going to go to the jury in any event, we do not finally decide this question.

### III

#### *The Anti-Assignment of Claims Act Question*

■ The Anti-Assignment of Claims Act, 31 U.S.C. § 203, provides that all transfers and assignments of any claim upon the United States made before the allowance of such a claim shall be absolutely null and void. It is not disputed that the agreement between Mrs. Marina Oswald and the plaintiff King constituted a voluntary transfer and assignment. Likewise, it is undisputed that the United States has made no allowance of any claim concerning the weapons. However, there is a very real question as to the existence of any claim against the United States on or before the effective date of the assignment of the weapons from Mrs. Oswald to the plaintiff King. If there was no claim against the United States

in existence on the date of the assignment then, of course, Section 203 of 31 U.S.C. would not apply. A prerequisite to a claim arising against the United States is a "taking" of the weapons by the United States.

■ The government took physical possession of the weapons in November 1963, and such possession has continued to date. However, mere possession does not axiomatically result in a taking of a property interest by the government. The defendant's authorities, including United States v. Dow, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958); Toles v. United States, 371 F.2d 784 (10th Cir. 1967); Aaron v. United States, 340 F.2d 655, 167 Ct.Cl. 818 (1964); Nevens v. United States, 212 F.2d 670 (9th Cir. 1954), do not support this. The possession of the property by the government in those cases was a possession with the intent to "take" the property interest. We find that the government's possession of the rifle and revolver from November 1963 to November 1, 1966 was a mere custody of the weapons for the purpose of facilitating the investigation then being conducted by the Warren Commission, and that the actual taking of a property interest in the rifle and revolver by the government occurred on November 1, 1966, when the Attorney General, pursuant to Public Law 89–318, 79 Stat. 1185, published in the *Federal Register* a list of the items that were to be taken by the United States.[3] The United States indicated no intention to actually "take" a property interest in the weapons at any time before Public Law 89–318 was enacted on November 2, 1965. In fact its outward manifestations until that date were that the weapons were being held

3. Public Law 89–318, 79 Stat. 1185 provides:
   "Sec. 2. (a) The Attorney General is authorized to determine, from time to time, which items should, in conformity with the declaration contained in the first section of this Act, be acquired and preserved by the United States. Each such determination shall be published in the Federal Register.

   (b) Whenever the Attorney General determines that an item should be acquired and preserved by the United States, all right, title, and interest in and to, that item shall be vested in the United States upon the publication of that determination in the Federal Register."

774

solely for the purposes of the Warren Commission investigation.[4]

■■■ We conclude then that the United States did not acquire a property interest in the weapons until November 1, 1966. It follows that the Anti-Assignment of Claims Act, 31 U.S.C. § 203, is not applicable.

### IV

### *The Issue of Just Compensation*

The Statute which was passed by the Congress, Public Law 89–318, for the purpose of insuring acquisition by the government of all of the property associated with the President Kennedy assassination, authorizes the payment of just compensation to the owner of any such item acquired by the United States. The Congress considered whether a definition of just compensation should be included, but finally concluded that this should be left to the courts. The House Report noted that

> "One private party has already filed suit against the Attorney General of the United States for possession of the assassination weapon and the .38 caliber revolver involved in the death of Police Officer Tippit * * *." H.R. Rep.No.813, 89th Cong., 1st Sess. 2–3 (1965).

The report then went on to say that since just compensation is grounded in the

Constitution, a legislative definition would not be binding on the courts.[5]

It is understandable that the Congress did not undertake to define fair compensation in this unique, unprecedented and most difficult fact situation. The standard to be employed is no less difficult for us even though we do have the advantage of being able to call on a jury of citizens to determine and pronounce what is fair compensation, for we can not leave it to the uncontrolled discretion of the jury but must seek out guidelines to aid the jurors in finding a fair and just verdict.

The starting place in this quest for a standard is the contentions of the parties. The government is understandably unwilling to give even an inch. It contends that the plaintiff is to be limited to the amount originally paid for the weapons by Oswald, that is, $51.40. The argument is that the plaintiff is not entitled to any enhancement growing out of the assassination; that to do so is like allowing a murderer to collect life insurance proceeds from the insurer of the victim.

The plaintiff, Mr. King, argues that he is entitled to the full market value and that at the trial he should be allowed to introduce the opinions of experts as to what the weapons are likely

---

4. See Telegram from J. Lee Rankin, General Counsel to Warren Commission, to Marina Oswald, September 24, 1964, Exhibit one attached to defendant's motion for summary judgment. The telegram states:

"I was unable to reach you by telephone yesterday to explain about photos, letters, documents and other personal effects. We are arranging to have these returned to you as soon as it can be done and adequately protect the requirements of the Commission's report * * *."

5. "The effect of this legislation would be to deny the plaintiff possession of these items but would afford due process of law by providing a procedure for recovering just compensation.

The need for just compensation stems from the mandate in the fifth amendment

to the Constitution: ' * * * nor shall private property be taken for public use, without just compensation.' The committee considered the question of the measure of damages but was advised that a legislative definition of 'just compensation' would, in all events, be ineffective to bind or instruct the courts in the application of this constitutional standard (Monongahela Navigation Company v. United States, 148 U.S. 312, 327, 13 S. Ct. 622, 37 L.Ed. 463 (1893) ; Shoemaker v. United States, supra (147 U.S. 282, at 302, 13 S.Ct. 361, 37 L.Ed. 170) ; United States v. Cors, 337 U.S. 325, 331, 333, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949)). *Accordingly, the bill leaves the question of just compensation to the courts.*" H.R. Rep. No. 813, supra, at 3. (Emphasis added).

to sell for on the open market. He demands $5,000,000.

We have concluded that neither of these positions is wholly valid. The government's position is unacceptable because it overlooks the fact that Congress has vested the court with the responsibility of determining fair compensation, not at the time of purchase by Oswald but rather as of the time that the Attorney General made a declaration of taking. Secondly, original purchase price in and of itself is not an accepted standard for determining fair compensation. It is at most a factor to be weighed and considered in relationship to intrinsic value or actual value to the owner.[6]

The demand of plaintiff for $5,-000,000 is on its face inequitable—in fact unconscionable—and would appear to be based on some projected market value which could only arise from the fact that these are curiosities which derive their character as such from the assassination and which can be exhibited on a profit basis. But the uniqueness of the items in question, in our opinion, precludes reception of evidence of market value. We can see no demonstrable market for these particular objects.

**A. *Inapplicability of Market Value.***

Ordinarily the reasonable market value of property taken, lost or destroyed is held to be the proper measure of damages to be awarded. The theory behind this is that the injured party is made whole if he is given money with which to buy equivalent property in the market place.[7] This is regarded as the most fair and equitable approach to an award of damages in these circumstances. The courts also recognize, however, that market value does not apply to every fact situation where, for example, the property is peculiar or unique, is not an object of commerce, and has no market value.[8] To further demonstrate this, the most cogent evidence in a value determination is comparable sales; that when the property is so unique that there are no comparable sales, it follows that the property does not have a market value. The weapons here in dispute are of this nature.

Where as here the market value criterion is not available, it does not follow that the aggrieved party cannot recover or is relegated to nominal damages.[9] Even in this situation the courts seek to compensate the injured party on a just and equitable basis, the burden being on claimant to prove that he has suffered substantial damages. Needless to say, the award cannot be based upon mere speculation. Id.

Consistent with our holding that the weapons here do not have a market value, we conclude that the witnesses must not be allowed to give their opinions on reasonable market value since this would amount to mere speculation.[10] It would be obvious conjecture

6. See 12 A.L.R.2d 902, 911–23 (1950).

7. 12 A.L.R.2d 902, 906 (1950).

8. Rhoades, Inc. v. United Air Lines, Inc., 224 F.Supp. 341, 344 (W.D.Pa.1963); Wood v. Cunard, S.S. Co., 192 F. 293, 296, 41 L.R.A.,N.S., 371 (2d Cir. 1911); Beale v. City of Boston, 166 Mass. 53, 55, 43 N.E. 1029, 1030 (1896); 12 A.L.R.2d 902, 906 (1950).

9. Rhoades, Inc. v. United Air Lines, Inc., 224 F.Supp. 341, 344 (W.D.Pa.1963); Blake Co. v. United States, 275 F. 861, 863 (S.D.Ohio 1921), aff'd, 279 F. 71 (6th Cir. 1922); Agency of Canadian Car & Foundry Co. v. Pennsylvania Iron Works Co., 256 F. 339, 347 (3d Cir.

1919); The H. F. Dimock, 77 F. 226 (1st Cir. 1896); 12 A.L.R.2d 902, 906 (1950).

10. Rhoades, Inc. v. United Air Lines, Inc., 224 F.Supp. 341, 344 (W.D.Pa.1963) (This was an action brought against the defendant airline to recover damages for an airboat destroyed in transit. The court held that *evidence of market value was properly rejected because* the airboat involved was one of a kind, *it was a unique contrivance,* it had no known application as a utility, *and it had no market value.*); Crisp v. Security National Ins. Co., 369 S.W.2d 326, 329 (Tex. 1963) (The court stated that "[w]here property * * * has no recognized

to permit an expert, how ever well versed, to project an opinion as to the price that a hypothetical museum might be apt to pay. Such evidence could only tend to confuse and disturb the jury, and in the end the court would be constrained to instruct the jurors that such evidence has no probative value. Similarly, value which these instruments might acquire in the years, decades or centuries to come cannot be considered since it is value at the time of the taking that is in issue.[11]

### B. Loss of Profits is not an Applicable Guide.

Similarly, loss of anticipated profits is not properly to be considered by a jury. As we view it, testimony that the plaintiff here anticipated commercial exhibitions on a profit basis would not be proper here because again the evidence would be conjectural or speculative. See United States v. Griffith, Gornall & Carman, Inc., 210 F.2d 11, 13 (10th Cir. 1954); 25 C.J.S. Damages §§ 42(b), 90 (1966); 15 Am.Jur., Damages §§ 150, 157 (1938); Flame Coal Co. v. United Mine Workers of America, 303 F.2d 39, 97 A.L.R.2d 1136 (6th Cir. 1962); Fireside Marshmallow Co. v. Frank Quinlin Const. Co., 213 F.2d 16 (8th Cir. 1954).

In *Griffith* our Circuit Court held that anticipated profits from a business which is contemplated but not established are too remote and speculative to furnish a basis for the award of damages. Loss of profits can be considered, according to the Court, only when the business has been in existence and has a profit history. The contemplated business here, if indeed it was contemplated, does not fill the bill, so to speak.

The remaining possible criteria which apply where market value is not aplicable are ·*first*, intrinsic value and, *secondly*, actual value to the owner. The element of original cost is, of course, relevant to both of these concepts.[12]

### C. Intrinsic Value as a Guide.

Intrinsic value is generally defined as "the true, inherent and essential value of a thing, not depending upon accident, place or person but the same everywhere and to everyone."[13]

This is then a limited concept which does not include any association between the owner and the item, nor any use of the item by the owner, nor any significance which society might assign to it. Rather, it involves a consideration of such elements as replacement cost new, depreciation, obsolescence, if any, anticipated serviceable life, and general usefulness of the item involved. Ordinarily this standard applies to property which can be replaced.[14]

---

market value, the actual value to the owner must be determined without resort to market value."); Houston & T. C. R. Co. v. Ney, 58 S.W. 43 (Tex.Civ. App.1900) (The court said that the actual value which the owner of nonmarketable property may recover for its destruction when it cannot be replaced or reproduced does not include the amount for which he could sell it to others, but the actual loss in money he would sustain by being deprived of the value of the articles.)

11. See, e. g., United States v. Griffith, Gornall & Carman, Inc., 210 F.2d 11 (10th Cir. 1954). In this case, the Circuit Court succinctly set forth the principle that witnesses will not be allowed to speculate:

" 'Actual damages only may be secured. Those that are speculative, remote, un-certain, may not form the basis of a lawful judgment. The actual damages which will sustain a judgment must be established, not by conjectures or unwarranted estimates of witnesses, but by facts from which their existence is logically and legally inferable. The speculations, guesses, estimates of witnesses, form no better basis of recovery than the speculations of the jury themselves.' " 210 F.2d at 13.

12. 12 A.L.R.2d 902, 911–23 (1950).

13. Ohio Casualty Ins. Co. v. Stewart, 76 S.W.2d 873, 878 (Tex.Civ.App.1934).

14. See, e. g., Ohio Casualty Ins. Co. v. Stewart, supra; Alderete v. Cabello, Tex. Civ.App., 278 S.W. 950 (1925); Palin v. General Construction Co., 47 Wash.2d 246, 287 P.2d 325 (1955).

■ Original cost is, of course, an element in determining intrinsic value. This would include not only the cost to Oswald but also the amount paid by plaintiff. On the other hand, enhancement of original cost or replacement cost enhancing market value based on association of these items with the assassination does not appear to be properly allowable.

### D. *Value to the Owner.*

■ The remaining and perhaps more logical and suitable consideration is that of *value to the owner.* This is a somewhat subjective method which allows the owner to testify as to his valuation, as to how he arrives at it, and at the same time the jury is told that his testimony is not binding on it, but is merely to aid the jury in arriving at a fair and just verdict. See Rhoades, Inc. v. United Air Lines, Inc., supra. The jury's conclusion as to value seldom coincides with the owner's estimate because his testimony is usually colored by his desire for an inflated recovery.[15] Indeed, the jury must give the property an objective evaluation, that is to say, the reasonable owner in the plaintiff's exact position.[16] The parties are not limited to the owner's estimate. Evidence is admissible as to the cost of the property, nature and character of it, and the manner in which the owner used the property.[17]

■ The plaintiff contends that regardless of the standard employed, he is entitled to show the historical value of these weapons. Certainly in any jury trial the inherent and surrounding circumstances must inescapably be presented. It does not follow that the plaintiff is entitled to show, as we have previously indicated, historical significance as it might affect market value. The most that plaintiff can hope to present will be proof as to the nature of the property in relationship to its value to *him.* The objection generally to historical value is its difficulty of proof. This has not, however, prevented the courts from seeking to give some weight to this factor in connection with family portraits and heirlooms.[18] Apparently the courts seek to compensate owners for *personal* loss arising from this factor. Thus, historical value will have to be limited to this aspect of personal use and enjoyment. Undoubtedly the plaintiff attributed some value here based on these instruments being conversation pieces. It seems fair to permit the jury to consider this element.[19]

In summary then we conclude that from the standpoint of positive law, reason and equity the following principles apply:

1. That the plaintiff is not entitled to introduce evidence as to reasonable market value.

2. That the plaintiff is not entitled to introduce evidence as to theoretical loss of profits.

3. That either party may introduce evidence as to intrinsic value as here defined.

15. 1 J. Bonbright, The Valuation of Property 93 (1st ed. 1965 reprint).

16. "When the courts depart from the standard of market value and adopt value to the owner or some apparent synonym like 'real value,' they seem to have (how owner would value his property if he made an intelligent valuation in light of data available on valuation date) in mind. But the cases show no perfect consistency on this point." 1 J. Bonbright, The Valuation of Property 93 (1st ed. 1965 reprint).

17. 12 A.L.R.2d 902 (1950).

18. See, e. g., Green v. Boston & Lowell R.R., 128 Mass. 221 (1880) ; Louisville & N. R. R. v. Stewart, 78 Miss. 600, 29 So. 394 (1901) ; Bateman v. Ryder, 106 Tenn. 712, 64 S.W. 48 (1901) ; Contra, Lack v. Anderson, 27 So.2d 653 (La.App., 1946).

19. See, e. g., Barker v. Lewis Storage & Transfer Co., 78 Conn. 198, 61 A. 363 (1905) ; Rutherford v. James, 33 N.M. 440, 270 P. 794, 63 A.L.R. 237 (1928) ; Smith v. Mine & Smelter Co., 32 Utah 21, 88 P. 683 (1907) ; See generally 63 A.L.R. 240 (1929).

4. That plaintiff is entitled to introduce evidence as to the value of the property to him as owner within the limits that are set forth above.

Finally, the defendant's motion for summary judgment is denied, and the matter will be set for trial to a jury at an early date.