**Marina N. Oswald PORTER, Individually, etc., et al., Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 72–1426.**

United States Court of Appeals, Fifth Circuit.

Feb. 26, 1973.

Rehearing Denied March 12, 1973.

Erich F. Klein, Jr., Dallas, Tex., for plaintiffs-appellants.

Eldon B. Mahon, U. S. Atty., Fort Worth, Tex., Kenneth J. Mighell, Asst. U. S. Atty., Dallas, Tex., Irwin Goldbloom, Gen. Litigation Section, Morton Hollander, Civ. Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before TUTTLE, WISDOM and SIMPSON, Circuit Judges.

TUTTLE, Circuit Judge:

This action was brought by Marina Oswald Porter, widow of Lee Harvey Oswald, to recover just compensation for certain of Oswald's personal effects taken by the United States pursuant to a special act of Congress. The district court, 335 F.Supp. 498, concluded that the compensation to which Mrs. Porter was entitled was the sum of $3000, which amount represents the stipulated market value of property similar in kind to the items involved in this proceeding. Judg-

ment was entered accordingly and Mrs. Porter appeals. We reverse.

Stated in chronological order, these are the pertinent facts: Following the assassination of President John F. Kennedy on November 22, 1963, government agents seized, for investigatory purposes, certain items of personal property belonging to Lee Harvey Oswald, who was suspected of having shot the president.[1] The property thus seized consisted mainly of Oswald's personal effects such as personal letters, a diary, family photographs, a marriage license, the contents of his wallet, and the like. This property was apparently in relatively good condition when seized, but during the course of investigation, some of the items were stained, discolored, or otherwise damaged as a result of chemical treatment and analysis by the Federal Bureau of Investigation (hereinafter FBI).

Subsequently, on September 24, 1964, the Warren Commission, which had been appointed for the purpose of conducting a plenary investigation into the assassination, submitted to President Lyndon Johnson its conclusions and final report, which thereafter was released to the public. The report concluded that Oswald, who by then was himself dead from an assassin's bullet, had killed the president. It contained copies of many of Oswald's writings which had been seized by the FBI immediately after the assassination.

Following submission of the report, Congress determined that it would be advisable to preserve certain of the items of evidence which the Warren Commission had considered. To that end Public Law 89–318 [2] was enacted on November 2, 1965. It provides:

" . . . [I]t is hereby declared that the national interest requires that the United States acquire all right, title, and interest, in and to, certain items of evidence, to be designated by the Attorney General pursuant to section 2 of this Act, which were considered by the President's Commission on the Assassination of President Kennedy (hereinafter referred to as 'items'), and requires that those items be preserved by the United States.

"Sec. 2. (a) The Attorney General is authorized to determine, from time to time, which items should, in conformity with the declaration contained in the first section of this Act, be acquired and preserved by the United States. Each such determination shall be published in the Federal Register.

"(b) Whenever the Attorney General determines that an item should be acquired and preserved by the United States, all right, title, and interest in and to, that item shall be vested in the United States upon the publication of that determination in the Federal Register.

\* \* \* \* \* \*

"Sec. 3. The United States Court of Claims or the United States district court for the judicial district wherein the claimant resides shall have jurisdiction, without regard to the amount in controversy, to hear, determine, and render judgment upon any claim for just compensation for any item or interest therein acquired by the United States pursuant to section 2 of this Act; and where such claim is filed in the district court the claimant may request a trial by jury: *Provided,* That the claim is filed within one year from the date of publication in the Federal Register of the determination by the Attorney General with respect to such items."

On November 1, 1966, in accordance with the procedures set forth in Section 2 of the Act, the United States took the steps prescribed to acquire title to the items of Oswald's personal property which are the subject of this appeal. This action was brought under Section

---

1. No contention is made here that the seizure for the purpose of investigation was illegal.

2. 79 Stat. 1185.

3 of the Act by Oswald's widow in the District Court for the Northern District of Texas to recover "just compensation," as provided in the Act, for the items taken.

In pre-trial proceedings the parties stipulated that the market value of items of personal property similar in kind to the items involved here would have a value of $3000. The court, however, denied the government's motion to limit the claimant's recovery to that amount, and appointed a Special Master, pursuant to Rule 53 F.R.Civ.P., for the purpose of hearing evidence and making findings as to the value of the property. Upon hearing, each party offered the testimony of an expert witness concerning such value. Although their valuations differed to a considerable extent, both agreed that there existed what might be called a "collector's" market for the property created by the public's belief that Oswald had assassinated President Kennedy.[3] Thereafter, the Special Master adjourned the hearing and requested instructions from the court with regard to the date at which the property should be valued.

The court, in turn, ordered 1) that the subject property be valued in its condition as of November 1, 1966 (the date upon which the list of items to be acquired by the United States was published in the Federal Register); 2) that the date of "taking" was November 1, 1966; 3) that any change in the property's condition between the time of its seizure in November, 1963 and November, 1, 1966 did not constitute a compensable "taking"; and 4) that the items were, therefore, to be valued in their damaged and published condition. Following a further hearing and in accordance with these instructions the Special Master concluded that the property, as of November 1, 1966, was worth $17,729.37.

Thereupon the government renewed its motion to limit plaintiff's recovery to $3000, and the court this time granted the motion and entered judgment accordingly. Mrs. Porter appeals from that determination.

She contends that it was error for the court to award compensation without regard to the souvenir or collector's value of the items taken and, further, that in order properly to compensate her for her loss, the property should have been valued in its undamaged and unpublished condition as of the time of its seizure by agents of the FBI in 1963.

■ We consider first whether, under the peculiar circumstances of this case, the collector's value of what can only be considered as entirely commonplace items of personal property ought to be the measure of compensation to which the claimant is entitled. In this respect the evidence is clear that but for the enhancement in value attributable solely to public demand created by virtue of association in the public mind with the assassination of President Kennedy, the items in question would be practically worthless.[4] We are nonetheless of the view that, under established concepts of "just compensation," Oswald's widow should be compensated for precisely that which was taken, in this instance, items of personal property having an historical significance and, there-

---

3. Plaintiff's witness testified that the value of the property, in its undamaged condition prior to seizure by FBI agents in November, 1963, and considering it as unpublished material, was $95,000. In damaged condition and in view of publication of portions thereof in the Warren Commission Report, he found its value to be $40,000. The government's witness, who did not consider the potential value of publication rights, fixed the value of the property in good condition at $70,000 and in its damaged condition at $10,000.

4. Indeed the stipulated figure of $3000 for items of personal property similar in kind probably overstates to a considerable extent the intrinsic market value of such items. So far as we are able to perceive there would be no appreciable market for someone else's photographs, letters, and personal knick-knacks, or for such things as old pamphlets, a brown paper bag from a Texas post office, two magazine ads from "Klein's Sporting Goods", and the like.

**1334**

fore, a realizable value quite apart from intrinsic value.

■ Though the measure of just compensation has never, and rightfully so, been reduced to a formula, United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1948), it is fair to say that the most frequently-applied standard is that of "fair market value," assuming, of course, that a viable market exists. See, e. g., United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336 (1942). Otherwise put, just compensation means the full monetary equivalent of the property taken, United States v. Reynolds, 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970), or indemnity, measured in money, for the owner's loss. United States v. Certain Property in Borough of Manhattan, etc. . . . , 403 F.2d 800 (CA 2, 1968). Significantly, the test is invariably applied with specific regard to the value of what the owner has lost, rather than the value of what the taker has gained. Thus, it is said that the owner is entitled to be put in as good a position pecuniarily as if his property had not been taken. E. g., United States v. Virginia Electric Co., 365 U.S. 624, 633, 81 S.Ct. 784, 5 L.Ed.2d 838 (1960).

■ Applying these general rules to the facts of the case before us, United States v. Lee, 360 F.2d 449 (CA 5, 1966), we note that were it not for the government's exercise of its powers of eminent domain here, Oswald's widow would have been able to realize, through sales to the public, the collector's value of the items in question. It is particularly significant, we think, that both expert witnesses at the proceedings in the district court testified that there was a viable market, albeit a collector's market, for the items for which Mrs. Porter here seeks compensation. This market, an unfortunate byproduct of the assassination of President Kennedy, existed independently of the government's need of the property for investigatory purposes, and thus it is apparent that, even absent governmental intervention, Oswald's personal effects would have had a very real value, in excess of their intrinsic value, which might have been realized by his widow, the owner thereof. Therefore, in order to put her in the same position monetarily as she would have been in had the property not been taken, it is necessary, in fixing the measure of compensation, to include the incremental element of value attributable to collector's demand.[5]

The government, to the contrary, contends that the enhanced value of the property was directly related to the events which gave rise to the government's special needs in taking it, and that any incremental value arising out of the government's special needs is not properly an element of just compensation to the owner. In support of this proposition it cites, among others, United States v. Cors, supra, and United States v. Miller, supra. We do not think, however, that the rationale behind these cases is applicable to the case before us.

The Cors case, for instance, involved a suit to recover just compensation for

---

5. We are not unmindful that the District Court for the District of Colorado reached a contrary result with regard to directly analogous facts. King v. United States, 292 F.Supp. 767 (1968). The case involved the question as to the proper measure of compensation for the taking by the government of certain weapons connected with the Kennedy assassination. The court reasoned that "when the property is so unique that there are no comparable sales, it follows that the property does not have a market value." 292 F. Supp. at 775. The court concluded, therefore, that no expert witnesses would be allowed to give their opinions on reasonable market value of the subject property. Here, of course, both the witness for Porter and the witness for the government testified that there was in fact a market for the property and that such property had an ascertainable market value. The government does not argue here that the trial court erred in permitting testimony with regard to market value or that the figure reached by the Special Master does not fairly reflect what the property is worth. We, therefore, do not consider the point.

the taking, under wartime requisition, of a tugboat. At the time there was a rising market and a strong demand for tugs partly as a result of the government's requisition program. The Court held that any enhancement in value attributable to the government's demand could not be recovered, stating that "[i]t is not fair that the government be required to pay the enhanced price which its demand alone has created." 337 U.S. at 333, 69 S.Ct. at 1091.

Similarly, in the Miller case, the question was whether the government should be obliged to pay a premium for lands which it proposed to condemn, where such premium merely reflected an element of value which the government itself, by expressing its intention to take the property, had created. The Court held that the owners were not entitled to recover this incremental value.

■ Plainly this line of cases does not govern the Oswald-Porter case. As noted, there existed here a collector's market for the items in question quite apart from the government's need therefor. That being so, the government will not be, in any sense, required by our decision in this case to reimburse Oswald's widow for any increment in value which the government itself created.

■ The government argues further that on policy grounds the enhanced value of the property attributable to its association with the assassination of the president should not, in fairness, be awarded to the wrongdoer's survivor. Although we agree in principle with the cases cited to us by the government in support of its argument,[6] nonetheless we find that the case before us arises in a context which renders such policy considerations inapplicable. This proceeding involves quite simply the measure of compensation to be afforded the owner of property taken by the government. Were it not for the taking, the owner, Oswald's widow, would have been able to realize a premium for Oswald's personal effects simply because of their association with the killing of the president, this, regardless of whether this court condones, as a matter of policy, the realization of any premium attributable to such a crime. However, this peculiar interest in the property having vested in Oswald's widow, the court's function upon condemnation should be limited merely to assessing the value of the interest taken; in this instance of course, the taking deprived the owner of the collector's value which otherwise she would have enjoyed and for which, therefore, she is entitled to be compensated.

■ Our inquiry however, does not terminate at this point. Mrs. Porter claims that she is entitled to recover the fair market value of the property in its condition as of November 22, 1963, that is, when it was as yet undamaged by government agents and unpublished. To an extent the correctness of this claim depends on when exactly the property was "taken" or appropriated by the government, since, under the law of eminent domain, it is axiomatic that the compensation to which the owner is entitled is measured by the value of the property as of the date of taking. Mrs. Porter contends that the date of taking here was in 1963 when agents of the FBI seized the subject property for purposes of investigation. The district court, however, held that the date of taking was November 1, 1966 when the list of items to be acquired by the government was published in the Federal Register, as provided by Public Law 89–318. We think the district court's determination is correct.

■ Though the government took physical possession of the property in November, 1963, mere possession does not ipso facto establish that there was an actual "taking", in the constitutional sense, for which compensation would be required. King v. United States, supra

---

6. New York Mutual Life Insurance Co. v. Armstrong, 117 U.S. 591, 6 S.Ct. 877, 29 L.Ed. 997 (1886) ; Continental Bank and Trust Co. v. Maag, 285 F.2d 558 (CA 10, 1960) ; Kingsland v. Mayor, 110 N.Y. 569, 18 N.E. 435 (N.Y., 1888).

n. 5. The weight of authority is that in order to constitute a taking, the condemnor must have an intention to appropriate,[7] and in this case the requisite governmental intent was not manifested until the list of items to be acquired was published in the Federal Register. Up until then the government might very well have returned that which it had seized and, for all that appears, those items which had not been listed were in fact returned to their owners.[8] We conclude therefore, that the date of taking was November 1, 1966. Cf. Murray D. Stringer et al. v. United States of America, 5 Cir., 471 F.2d 381, 1973 (where the United States unequivocally and openly manifested its purpose to "take" the real property several years before the Tucker Act suit was brought).

Notwithstanding that conclusion, it is argued by Mrs. Porter that she is otherwise entitled to compensation for damage to the property caused by the FBI during its investigation and for the diminution in the copyright value of Oswald's writings owing to their publication in the Warren Commission report.

■■■■■ We consider first the claim with regard to the damage, in the form of staining and discoloration, to some of the documents handled by the FBI. Properly framed, the question posed by her claim is as follows: If the government had not taken the particular property on November 1, 1966, but instead had returned it to Mrs. Porter, would the government have been monetarily liable for such damage? We think not. Under the circumstances of this case, we think that the sort of damage complained of does not of itself amount to an implied taking for which compensation would be constitutionally required.[9] Since there was no "taking" in this instance when the documents were damaged and, there being no other potential basis for recovery under the Tucker Act,[10] the claimant's recourse, if any, must be found in the Federal Tort Claims Act.[11] Even so, the claim must fail. While reserving judgment as to the question whether an

---

7. See, e. g., J. J. Henry Co. v. United States, 188 Ct.Cl. 39, 411 F.2d 1246 (1969) ; Sayre v. United States, 282 F.Supp. 175 (D.C. Ohio, 1967) ; B. Amusement Co. v. United States, 148 Ct.Cl. 337, 180 F.Supp. 386 (1960).

8. The court in King v. United States, supra, n. 5, noted that until Public Law 89–318 was passed in November, 1965, the government's outward manifestations were that the property seized was being held in custody, temporarily, for purposes of the Warren Commission investigation. Though it is not a part of the record in the case before us, the court quoted from a telegram from Lee J. Rankin, then General Counsel of the Warren Commission, to Marina Oswald, dated September 24, 1964. The telegram purportedly advised Mrs. Oswald that

"I was unable to reach you by telephone yesterday to explain about photos, letters, documents and other personal effects. We are arranging to have these returned to you as soon as it can be done and adequately protect the requirements of the Commission's report . . . ."

292 F.Supp. at 774, n. 4.

9. It is true, of course, that under appropriate circumstances damage to property will be construed as a taking. See, e. g., Eyherabide v. United States, 170 Ct.Cl. 598, 81 F.2d 565 (1965). However, in the context of a criminal investigation those considerations which give rise to the implication of a governmental taking merely because of damage do not so forcefully apply. Though we have been unable to find any case directly in point, we feel that this is the kind of case where damage to property may rightfully be distinguished from a taking. Cf., Bartholomae Corp. v. United States, 135 F.Supp. 651 (D.C.Cal., 1955) ; Yazel v. United States, 118 Ct.Cl. 59, 93 F.Supp. 1000 (Ct.Cl., 1950) ; Gallerani v. United States, 41 F.Supp. 293 (D.C.Mass., 1941).

10. The core of the Tucker Act is contained in 28 U.S.C.A. § 1346(a)(2) and 28 U.S.C.A. § 1491. In general it provides a cause of action against the United States for claims founded on "the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

11. 28 U.S.C.A. § 1346(b), § 2671 et seq.

individual whose property has been negligently damaged by the FBI in the course of an investigation can recover under the Tort Claims Act, we think it evident at the very least that Mrs. Porter cannot. It is noted that Section 2680(a) of the Act[12] specifically exempts the United States from tort liability with regard to "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation. . . ." Absent, as here, any proof or even allegation that the damage was due to negligence, it must be assumed that the agents of the FBI responsible for damaging the documents were properly carrying out their appointed functions.[13]

We turn finally to the question whether Mrs. Porter can recover for the diminution in value of Oswald's writings attributable to their publication in the Warren Commission Report. It is, of course, quite plain that the recovery sought here is for infringement by the government of Mrs. Porter's common law copyright interest in Oswald's writings. Such infringement is not a "taking" as the term is constitutionally understood. Rather, it has always been held that infringement of copyright, whether common law, Twentieth Century Fox Film Corp. v. Dieckhaus, 153 F.2d 893 (CA 8, 1948), or statutory, Turton v. United Staes, 212 F.2d 354 (CA 6, 1954) constitutes a tort.

Until recently it was generally assumed that the government was immune to suits for infringement of copyright.[14] To remedy this obviously inequitable situation Congress, in 1960, amended 28 U.S.C.A. § 1498, which theretofore had dealt exclusively with patent infringement, to include the following:

"Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States . . . the exclusive remedy of the owner of such copyright shall be by action against the United States in the Court of Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in Section 101(b) of Title 17, United States Code."

The government contends that since Mrs. Porter's claim is for infringement of copyright, her exclusive remedy must be in the Court of Claims, as provided by the statute. However, we are of the view that by Public Law 89–318, Congress intended to confer jurisdiction on the district courts to consider such claims even where, as here, exclusive jurisdiction is otherwise vested by statute in the Court of Claims.

However, we do not think this particular statute embraces common law copyrights. In the first place the statute, by its terms, covers any work "protected under the copyright laws of the United States. . . ." The copyright laws of the United States are contained in Title 17, U.S.C.A., and we note that copyrights at common law are specifically unaffected thereby. Section 2 of Title 17 so provides.

In the second place the statute, insofar as remedy is concerned, necessarily draws upon the remedies provided in Title 17 for infringement of statutory copyright. These remedies, of course, have little or no applicability where infringement of common law copyright is concerned. The latter is governed by state law. See 18 Am.Jur.2d, Copyright and Literary Property, § 7.

We think no recovery can be had for such action by the United States under § 1498 as amended.

12. 28 U.S.C.A. § 2680(a).

13. We note, however, that Mrs. Porter might have an administrative remedy under 31 U.S.C.A. § 224b which pertains to settlement of claims for damage caused by the FBI. Such a remedy though is exclusively within the province of the Attorney General and is not cognizable by the courts.

14. See Senate Report No. 1877 on H.R. 4059, 1960 U.S.Code Cong. and Admin. News, p. 3444.

 Moreover, the government claims to come within the "discretionary function" provision of the Tort Claims Act. We note that the Warren Commission was given a broad mandate to pursue its investigation of the Kennedy assassination. Its authority was founded on Executive Order No. 11130, issued by President Lyndon Johnson on November 30, 1963, which in pertinent part provides:

> "The purposes of the Commission are to examine the evidence developed by the Federal Bureau of Investigation and any additional evidence that may hereafter come to light or be uncovered by federal or state authorities; to make such further investigation as the Commission finds desirable; to evaluate all the facts and circumstances surrounding such assassination, including the subsequent violent death of the man charged with the assassination, and to report to me its findings and conclusions."

This order, having the force and effect of a statute or regulation,[15] vested in the Commission comprehensive powers to investigate and report. It is within this framework that Oswald's writings were reprinted in the Commission's report.

We are of the view that the decision whether or not to publish these writings was a matter clearly committed to the discretion of the Commission. It follows, therefore, that the government cannot be held liable in tort for copyright infringement by virtue of 28 U.S.C.A. § 2680(a) which pertains to any claim "based upon the exercise or performance . . . [of] a discretionary function or duty on the part of a federal agency or an employee of the Government. . . ."

We conclude, therefore, that the plaintiff is entitled to recover only the fair market value of the subject property as of November 1, 1966. This value has been found to be $17,729.37.

The case is reversed and remanded to the district court for entry of judgment in conformity with this opinion.

15. Cf., Farkas v. Texas Instrument, Inc., 375 F.2d 629 (CA 5, 1967); cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471.