## Commonwealth v. Rampy

*Edward M. Marsico Jr., deputy district attorney,* for the commonwealth.

*R. Russell Pugh,* for defendant.

DOWLING, *J.,* July 31, 1989 —

### *Pablo Got His Gun*[1]

AIDS has become the media's favorite topic, and if print and television are to be believed, the number one health concern of the public. You can scarcely pick up a newspaper or magazine or turn on the box without reading or hearing about its deadly consequences. However, its overall effect is quite minimal compared to the catastrophic results of the possession of guns. Perhaps it's because, aside from a few extreme religious moralists who feel that AIDS may be the Almighty's answer to drugs and homosexuality, no one espouses the "benefits" of this terrible disease. Yet more Americans die of

---

1. See *Johnny Got his Gun,* by Dalton Trumbo (Lipperman 1939), a terrifying book considered by many the most horrifying anti-war book ever written, surpassing Eric Remarque's *All Quiet on the Western Front.*

gunshot wounds every two years than have died to date of AIDS. In the July 17, 1989 issue of *Time* there is detailed the death by gun of some 464 people in one typical week in America. It concludes, "How can America think of itself as a civilized society when day after day the bodies pile up amid the primitive crackle of gunfire across the land?"

In the period of 1984 and 1985, firearm injuries in the United States totalled 62,897—more than the number of deaths in eight and one-half years of conflict in Vietnam. Comparisons are interesting. In 1985, 46 people were murdered with handguns in Japan, eight in Great Britain, 31 in Switzerland, five in Canada, 18 in Israel, five in Australia, and *8,092 in the United States*. Needless to say, all of these countries except for the United States have tough handgun control laws. On an average day, some 55 Americans are killed with handguns. In 1968, the National Commission on the Causes and Prevention of Violence estimated that Americans own as many of 90 million rifles, shotguns and handguns. Today that number may be as high as 200 million. There are an estimated 60 million handguns in circulation.

Why is this so? How did this inexplicable sorry state of affairs come about, and why is there so much opposition to doing something about it? Some say that the Constitution gives us the right to carry a gun. This fatuous position has long ago been dispelled. It is the favorite argument of the National Rifle Association, perhaps the most powerful lobby in the country, one which spends millions of dollars to defeat any measure of control, including the sale of machine guns, undetectable plastic handguns that can easily be smuggled onto airplanes, "cop-killer" bullets, and a seven-day waiting period for handgun sales. This is the wonderful organization that defended the sale of the AK-47 military assault

weapon that was used in the massacre of five innocent school children and the wounding of 31 others recently in Stockton, California. The National Rifle Association has long claimed that the American people have a Second Amendment right to keep and bear arms. Rarely, however, do they quote the amendment in its entirety. It reads:

"A well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."

According to the American Bar Association, "In addition to the four decisions in which the Supreme Court has construed the amendment, every federal court decision involving the amendment has given the amendment a collective militia interpretation and held that firearms control laws enacted under a state's police power are constitutional. Thus, arguments premised on the federal Second Amendment, or the similar provisions of the state constitutions, have never prevented the regulation of firearms."

On October 3, 1983, the Supreme Court rejected an appeal by the National Rifle Association to overturn the historic Morton Grove Handgun Control Ordinance which has prohibited the possession of handguns within the village's borders. The court's decision[2] reaffirmed government's right to control handguns.

The constitutional argument was actually laid to rest earlier in *United States v. Miller,* 307 U.S. 174 (1939) where in a case involving a statute prohibiting the transporting in interstate commerce of sawed-off shotguns, the court noted that the Constitution[3] granted to Congress the power:

"To provide for calling forth the Militia to execute

2. *Quilici v. Village of Morton Grove,* 965 F.2d 261 (1982), certiorari denied 464 U.S. 863 (1983).

3. Section 8, clauses 15 and 16 of the U.S. Constitution.

the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the militia according to the discipline prescribed by Congress.' With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view." 307 U.S. at 178.

The Constitution of Pennsylvania provides in Article I, section 21:

"The right of citizens to bear arms in defense of themselves and the state shall not be questioned."

This is identical to the constitutions of 1790 and 1883 and substantially the same as the Constitution of 1776. On its face, the language seems rather inane and would literally permit a drug lord to arm himself to defend his cache and a would-be assassin to protect himself from his victim's self-defense. The judiciary, however, have given it a more rational interpretation. In a very interesting case arising out of this court, *Commonwealth v. Kreps*, 25 Dauphin Rep. 335 (1922), President Judge Hargest sustained a special act of assembly (Act of April 12, 1873, P.L. 735) which prohibited the carrying of deadly weapons within the limits of the City of Harrisburg. In holding that this statute did not violate the Pennsylvania Constitution, Judge Hargest discussed the historical abuses which led to the constitutional provision. It seems that during the reign of Charles II, a statute was enacted which provided that no person without lands of a value of 100 pounds could be allowed to keep a gun. When

James II ascended to the throne (1685), he arbitrarily disarmed the Protestant population while permitting his Catholic cohorts to possess weapons. Judge Hargest thought that this, together with other abuses, produced the revolution by which James II was compelled to abdicate the throne in favor of William and Mary. During their reign Parliament passed a statute permitting Protestants to have arms for their defense. The opinion goes on to expound that, had the people retained their arms, they would have been able to resist the oppressive measures of King James. Therefore, it was reasoned that when Parliament allowed subjects who were Protestants to have arms for their defense, it did not mean for private defense but meant that as a body they might defend their rights and compel their rulers to respect the law. It was in this frame that our ancestors found it necessary to incorporate the Second Amendment into the Bill of Rights.

Judge Hargest also reaches the interesting conclusion that a pocket revolver or pistol is not included in the term "arms" as used in the Pennsylvania Constitution, but that this was a reference to weapons of warfare such as swords, guns, rifles, and muskets. "Arms to be used in defending the state and civil liberty - and not the pistols, bowie knives, brass knuckles, billies, and such other weapons as are usually employed in brawls, street fights, duels and affrays, and are only habitually carried by bullies, blackguards, and desperadoes to the terror of the community and the injury of the state." *Kreps* at 341.

The first tactic in trying to justify an untenable position is to misstate the issue. Thus, opponents of the death penalty speak of "judicial murder," proponents of abortion label their position "pro-choice," and those who would destroy our environment frame the case in terms of "free enterprise." So, too, with

the matter of guns. The NRA, and those who propagandize for it, conjure up pictures of a hunter stalking his game to provide meat for his hungry children, the homeowner defending his family from the rapacious intruder, and the shopkeeper protecting his hard-earned money. Somehow, they have been able to get away with the fallacious argument that any control of any type of weapons inevitably means their complete prohibition. This is a logical non sequitur, a historic fallacy, and a genuine red herring.

The essence of any society is the surrendering of certain individual rights for the common good. Licensing and regulation abound from those governing infant care centers to those regulating funeral directors. Almost all forms of transportation, communication, and occupation are regulated by the government. Drivers are licensed and cars must be registered, but has anyone noticed any decrease in their numbers? The sale of intoxicating beverages is tightly regimented. Yet, are they more dangerous than guns? And speaking of our bucolic hunter as he saunters through the woodlands with his faithful companion, Rin Tin Tin, it is interesting to note that, if the land is not posted, it is probably state game land; that he is required to have a hunting permit; that his dog must be licensed; and that the amount of game he can gun down is regulated. There is only one part of the scenario which escapes scrutiny, and that is the gun itself.

It is also noteworthy that we do have various, though minimal, forms of gun control. It is estimated that throughout the country there are some 20,000 laws imposing some type of control. Unfortunately, they are basically impotent and of little effect in controlling the senseless slaughter.

One would be well to reread at least the first few pages of Thomas Paine's "Common Sense" wherein

he traces the origin and design of government, admitting that, "Government-like dress is the badge of lost innocence; the palaces of kings are built upon the ruins of the bowers of paradise." In this crisis of stupidity, this anguish of slaughter, and this monument to greed, we need the voice of another Thomas Paine and the stirring language of a new edition of "Common Sense."

Well, now to the case at hand which, as one might suspect, has to do with guns; more specifically, the commonwealth's petition to confiscate and destroy a Smith and Wesson semi-automatic .9-millimeter pistol. Defendant, Pablo Timoteo Rampy, was arrested and charged with carrying the above weapon without a license in violation of section 6106(a) of the Crimes Code.[4] In view of certain extenuating circumstances,[5] he was recommended by the district attorney and accepted by the court for the ARD program. This is tantamount to a plea of guilty. Subsequently, the commonwealth filed a petition for confiscation and destruction of the gun, alleging that it was involved as contraband evidence. Defendant filed an answer denying the gun was contraband and alleging that he was the registered owner. He also filed a motion for return of the property on the grounds that the charge against him was simply his failure to have a license to carry the gun and that there was nothing inherently illegal about the weapon.

Rule 324 of the Rules of Criminal Procedure provides that a judge should hear such a motion, receiving evidence on any issue of fact, and restore the property unless the court determines that it is contraband in which case it shall be ordered to be

4. 18 P.S. §6106(a).

5. He had no criminal record, had worked as a counselor at a juvenile facility, and had served honorably in the army.

forfeited. The only factual evidence presented at the hearing was uncontradicted proof that the defendant was the lawful and registered owner of the weapon, and the circumstances surrounding the arrest; namely, that Mr. Rampy was injured in a motor vehicle accident and, as he was being taken away in the ambulance, told the police to be sure to get his handgun out of his truck. They obliged and, finding he had no license, brought the charge.

We must first distinguish between property which is contraband, per se, and so-called "derivative contraband." The former concerns objects whose mere possession is unlawful, such as cocaine or "moonshine" whiskey, while the latter encompasses articles whose status depends upon the use to which they are put, such as a motor vehicle, which while normally lawful, becomes contraband when used to transport illicit goods. While many may reasonably argue that handguns are, per se, evil and that their mere possession should be illegal, this is not the law. The point is that when the property sought to be confiscated and destroyed is not contraband, per se, there must be statutory authority to support its forfeiture. In *Commonwealth v. Schilbe*, 196 Pa. Super. 361, 175 A.2d 539 (1961), the court said, "Obviously in the absence of any statute providing for the forfeiture of a camera and its accessories used for the purpose of taking obscene pictures, there is no authority to do so." *Id.* at 361, 175 A.2d at 541.

In *Petition of Maglisco,* 341 Pa. Super. 525, 491 A.2d 1381 (1985), the Superior Court had a situation where Madame Maglisco shot her husband with a .38-caliber revolver which the police seized along with several rifles in her possession. The opinion does not indicate how Mr. Maglisco fared, but in any event the charges were dropped. The court had no trouble in ordering forfeiture of the

revolver since it was used to commit a crime, but held that the rifles which allegedly belonged to the mother-in-law could not be confiscated since they had not been used in the commission of any offense. Whether Mrs. Maglisco later shot her husband with one of the rifles is not indicated.

There is a lower court decision directly on point, *Commonwealth v. Spisak*, 69 D.&C. 2d 659 (1974), where then-President Judge Coffroth held that the court had no authority by virtue of any Pennsylvania statute or any common-law principle to declare forfeiture of an unlicensed loaded gun being transported through Pennsylvania in a car by a non-resident with no significant criminal record, where the gun was not listed as wanted according to a NCIC check. Judge Coffroth said, "Forfeiture should not automatically and in every case follow from conviction of crime with firearm involvement merely because the gun 'is of a dangerous nature and could be used for a dangerous use or purpose.' "

Pennsylvania has a number of express forfeiture statutes.[6] However, the firearm provisions of the Crimes Code under which defendant was charged do not contain any such provisions. Nor can we find any common-law support. The doctrine of attainder which provided for the forfeiture of a felon's estate, both real and personal, has been expressly abol-

---

6. Examples are: gambling devices under the Crimes Code, 18 Pa.C.S. §5513(5); liquor, equipment and vehicles under the Liquor Code of April 12, 1985, P.L. 90, as amended, 47 P.S. §6-601; vehicles with defaced serial number under the Vehicle Code of April 29, 1959, P.L. 58, 75 P.S. §303(b); drugs, containers, etc., under the Uniform Controlled Dangerous Substances Act of April 14, 1972, P.L. 165, 35 P.S. §780-128; explosives under the Crimes Code, 18 P.S. §6162(d); game and hunting devices, equipment, firearms and vehicles under the Games Law of June 3, 1937, P.L. 1225, 34 P.S. §§1311.1209, 1311.1214-16.

ished by both the Pennsylvania and federal constitutions.[7]

The ancient common-law doctrine of deodand, by which any personal chattel which was the occasion of someone's death was forfeited, has likewise been rejected in the United States. As a fascinating sidelight, in *King v. U.S.*, 364 F.2d 235 (5th Cir. 1966) the Circuit Court of Appeals refused the federal government's request when it sought forfeiture of the rifle used in the assassination of President Kennedy, rejecting the government's theory that it was a species of deodand stating:

"It would certainly be convenient and it would tend to hasten the termination of what must appear to many to be a very distressful bit of litigation were we able to accept the government's present theory and affirm the trial court's judgment forfeiting the weapons to the United States as a species of deodand."

Perhaps in a more orderly and civilized society, the mere possession of a handgun would be illegal and hence subject to confiscation. While this may be the law in many countries whose death rate by handguns is a fraction of that in the United States, it is a matter which would have to be resolved by the legislature. Although the National Rifle Association has recently suffered a series of setbacks, and the people are undoubtedly becoming more aroused by the problem, there is no reason to believe that handguns will be generally banned within the foreseeable future.

So, Pablo can have his Smith and Wesson semi-automatic .9-millimeter pistol back. One hopes that he will not use it to settle a traffic dispute as did several others within recent memory, incidents resulting in the death of the unarmed motorists.

7. Pennsylvania Constitution, Article I, section 19. U.S. Constitution, Article I, sections 9 and 10.

In a trial we presided over a few years back, one William Grant Miller shot and killed Gustave Dickow in an argument over double parking and horn blowing with a .38-caliber gun he was carrying on his person. We began that opinion with the quote, with which we will end this one:

*"When we are born, we cry that we are come to this great stage of fools."*[8]

Accordingly, we enter the following

### ORDER

And now, July 31, 1989, the commonwealth is to return to defendant his .9-millimeter pistol.

---

8. *King Lear*, Act 4, scene 4.